**EASTMAN KODAK COMPANY, Eastman Chemical Company, and Zimmer Aktiengesellschaft, Plaintiffs/Cross–Appellants,**

v.

**The GOODYEAR TIRE & RUBBER COMPANY, Defendant–Appellant,**

and

**Shell Oil Company, Defendant–Appellant.**

**Nos. 95–1511, 95–1512, 95–1532 and 95–1533.**

United States Court of Appeals, Federal Circuit.

May 20, 1997.

As Modified on Limited Grant of Rehearing July 2, 1997.

---

Hal D. Cooper, Jones, Day Reavis & Pogue, Cleveland, Ohio, argued for plaintiffs/cross-appellants. With him on the brief were James L. Wamsley, III, Regan J. Fay, Lester J. Savit, and Leozino Agozzino.

Donald R. Dunner, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., Washington, DC, argued for defendant-appellant The Goodyear Tire & Rubber Company. With him on the brief were Ford F. Farabow, Jr., Jerry D. Voight, and Martin I. Fuchs. Of counsel on the brief were Alvin T. Rockhill, III, The Goodyear Tire & Rubber Company, of Akron, Ohio, and Marshall Cox, Cahill, Gordon & Reindel, New York City.

W. Kyle Carpenter, Woolf, McClane, Bright, Allen & Carpenter, Knoxville, Tennessee, for defendant-appellant Shell Oil Company. Of counsel on the brief were Leonard P. Miller and Kimbley L. Muller, Shell Oil Company, Houston, Texas.

Before MAYER, LOURIE, and RADER, Circuit Judges.

Opinion for the court filed by Circuit Judge RADER. Circuit Judge LOURIE dissents in part.

RADER, Circuit Judge.

In this patent case, a jury found that Goodyear Tire & Rubber Company (Goodyear) and Shell Oil Company (Shell) infringed U.S. Patent No. 4,064,112 ('112 patent). The United States District Court for the Eastern District of Tennessee sustained the verdict that defendants' continuous solid state (CSS) production lines 1 and 2 infringed the '112 patent. The district court, however, granted defendants' motion for judgment as a matter of law (JMOL) that CSS lines 3–8, 10 and 11 did not infringe the '112 patent.

This appeal tests the correctness of the district court's claim interpretation. Upon review of the entire record, this court holds that the district court properly denied JMOL on the jury's finding of infringement by CSS lines 1 and 2. Additionally, the district court correctly dismissed the defendants' antitrust counterclaims, correctly declined to apply the defense of laches, and correctly granted JMOL of noninfringement by CSS lines 3–8, 10 and 11. Finding that plaintiffs waived their right to object to proper venue, this court reverses the dismissal of Goodyear's state law counterclaims. Accordingly, this court affirms-in-part, reverses-in-part, and remands for consideration of Goodyear's state law counterclaims.

## I.

The '112 patent issued to Hans Joachim Rothe, et al., (Rothe) on December 20, 1977. Rothe assigned the patent to his employer, Zimmer Aktiengesellschaft (Zimmer). The '112 patent claims a process for making granules of container-grade polyethylene terephthalate (PET). Container-grade PET granules are the central ingredient for a variety of products, including two-liter soft drink bottles.

Rothe's invention solved a significant problem in producing PET granulate. To make a granulate suitable for unbreakable bottles requires an increase in the molecular weight and intrinsic viscosity of PET. This increase occurs through the process of polycondensation or solid state polymerization. Polycondensation takes place in a "fixed bed" reactor. In the reactor, the PET granulate flows slowly downward while hot, inert gases pass through the PET to remove aldehyde byproducts. During polycondensation, the PET granulate can stick together and plug the large reactor vessel.

Rothe's invention solved this sticking problem without the addition of anti-sticking agents or expensive modifications to the reactor. Rothe learned that a crystallization step before polycondensation would prevent sticking. To prevent sticking, however, the crystallization must occur at temperatures at or above the polycondensation temperatures. Claim 1, the broadest claim of the '112 patent, from which all other claims depend, expresses the invention:

1. A process for the continuous production of high molecular weight polyethylene terephthalate by polycondensation in the solid phase from a dried, granulated polyethylene terphthalate, having an intrinsic viscosity of at least 0.15, which comprises *crystallizing the granulate* to a density of at least 1.390 g/cm under forced motion *at a temperature of 220 ° C to 260 ° C under an inert gas atmosphere,* passing the crystallized granulate at a constant or reduced temperature to a continuous fixed bed reactor, and, continuously polycondensing the crystallized granulate in said reactor while in contact with an inert gas stream *at a temperature equivalent to, or lower than, the crystallization temperature.*

'112 patent. (Emphasis supplied.)

Eastman Kodak Company[1] (Eastman) acquired the exclusive right to enforce the '112 patent from Zimmer in April 1990. In September of that year, Eastman brought suit

---

1. Eastman Chemical Company, which had previously been a division of Eastman Kodak Company, became a separate corporation in December 1993.

against Goodyear in the Eastern District of Tennessee to enjoin Goodyear from making container-grade PET under the patented process. Shell purchased Goodyear's accused production facility in December 1992. As part of this purchase agreement, Goodyear agreed to indemnify Shell for costs incurred in this infringement action.

Soon after Eastman filed suit, Goodyear filed its own action in the United States District Court for the District of Columbia. Goodyear charged that Eastman's acquisition and enforcement of the '112 patent violated federal antitrust and state unfair competition laws. On Eastman's motion, the district court transferred this suit to the Eastern District of Tennessee, where it was consolidated with Eastman's suit. At this point, Goodyear sought reexamination of the '112 patent. In February 1993, the Patent and Trademark Office (PTO) confirmed the patentability of all claims of the '112 patent. After discovery stretching into 1994, the district court dismissed Goodyear's federal antitrust claims with prejudice and struck the related patent misuse defenses.

Thus, after lengthy proceedings, the district court began trial. At trial, the parties principally contested the meaning of the claim phrase "at a temperature of 220 ° C to 260 ° C." Eastman read this language as one of several process parameters, suggesting the heating medium must comply with these limits. Goodyear, on the other hand, insisted that this claim limitation referred to the granulate or polymer itself, not the temperature of the heating medium.

During trial, this court issued its *in banc* decision in *Markman v. Westview Instr., Inc.*, 52 F.3d 967, 34 USPQ2d 1321 (Fed.Cir. 1995) (*in banc*), *aff'd*, — U.S. —, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 USPQ2d 1461 (1996). In accordance with this decision, the district court instructed the jury on the meaning of the patent claims. The court construed the temperature limitation in the crystallizing step to refer to the temperature of the heating medium, not the temperature of the granulate. Before giving the case to the jury, the trial court granted defendants' motion for JMOL precluding a finding of infringement by CSS lines 3–8, 10, and 11.

The court also declined to apply laches and equitable estoppel. Thus, the jury received only plaintiffs' claim of infringement by CSS lines 1 and 2. The jury found infringement of the '112 patent. The court convened a damages trial before the same jury, which awarded plaintiffs $12,000,000. The district court entered judgment on April 28, 1995, and denied defendants' subsequent JMOL motions.

## II.

### Claim Construction

■ As noted earlier, the central issue in this appeal—as is often the case in patent appeals in the wake of *Markman*, 52 F.3d at 989 (Mayer, J., concurring)("[T]o decide what the claims mean is nearly always to decide the case.")—is the district court's claim interpretation. Claim interpretation proceeds under the guidelines set forth by the *Markman* case. *Markman*, — U.S. —, 116 S.Ct. 1384, 134 L.Ed.2d 577; *Markman* 52 F.3d at 979. This court, speaking *in banc*, restated familiar principles of claim interpretation:

> 'To ascertain the meaning of claims, we consider three sources: The claims, the specification, and the prosecution history.' ... 'Expert testimony, including evidence of how those skilled in the art would interpret the claims, may also be used.

*Markman*, 52 F.3d at 979 (citations omitted). The claim language itself defines the scope of the claim. *See York Prods., Inc. v. Central Tractor Farm & Family Center*, 99 F.3d 1568, 1572, 40 USPQ2d 1619, 1622 (Fed.Cir. 1996). To learn the necessary context for understanding the claim language, however, a construing court may consult other sources, including the patent specification, the administrative record of patent acquisition, expert commentary from those of skill in the art, and other relevant extrinsic evidence. *Markman*, 52 F.3d at 979. In other words, a construing court does not accord the specification, prosecution history, and other relevant evidence the same weight as the claims themselves, but consults these sources to give the necessary context to the claim language.

■ The trial court construed the claim language "crystallizing the granulate to a density of at least 1.390 [grams per cubic centimeter] under forced motion at a temperature of 220 ° C to 260 ° C under an inert gas atmosphere" to set the temperature of the heating medium, not the temperature of the granulate, at between 220 ° C to 260 ° C. To determine the proper referent for the claim's temperature clause, this court examines principally the claim language and any syntactic signs of its meaning. *See Credle v. Bond,* 25 F.3d 1566, 1571, 30 USPQ2d 1911, 1915 (Fed. Cir.1994); *In re Hyatt,* 708 F.2d 712, 714, 218 USPQ 195, 197 (Fed.Cir.1983) ("A claim must be read in accordance with the precepts of English grammar.").

The claim calls for "crystallizing the granulate *to* a density of at least 1.390 g/cm3 *under* forced motion *at* a temperature of 220 ° C to 260 ° C *under* an inert gas atmosphere." '112 patent, col. 10, ll. 28–31 (emphasis added). In this context, according to Webster's II New Riverside University Dictionary, the word "to" means "with the resultant condition of" or "toward a specified state," the word "at" means "in the state or condition of," and the word "under" means "undergoing or receiving the effects of." Webster's II New Riverside University Dictionary, 1214, 134, 1256 (1988). Under normal rules of syntax, therefore, "at" and "under" implies a controlled value (such as a process parameter), whereas "to" implies a measured and intended goal or condition (such as a polymer temperature). This context suggests that a step performed "at" a temperature indicates a process condition, not the condition of the matter under process.

Removing the intervening phrases leaves the language "crystallizing the granulate . . . at a temperature of 220 ° C to 260 ° C." The "at" in the temperature clause thus modifies "crystallizing," a process, not "the granulate." Indeed the claim thrice refers to temperatures as process steps with the introductory preposition "at": (1) "crystallizing . . . *at* a temperature of 220 ° C to 260 ° C"; (2) "passing . . . *at* a constant or reduced temperature"; and (3) "polycondensing . . . *at* a temperature equivalent to, or lower than, the crystallization temperature." '112

patent, col. 10, ll. 28–36 (emphasis added). This sentence structure discloses that the preposition "at" preceding the temperature limitation refers to the process temperature of the heating medium, rather than the temperature of the polymer itself.

In addition, the final phrase in the claim discusses "a [polycondensation] temperature equivalent to, or lower than, *the crystallization temperature.*" This reference to "the crystallization temperature" identifies the earlier temperature limitation with the crystallization process step, rather than temperature of the granulate. The claim does not say "equivalent to, or lower than, the temperature of the granulate during crystallization," but instead says "equivalent to, or lower than, the crystallization temperature." As a process parameter, the 220 ° C to 260 ° C language specifies the temperature of the heating medium which performs the process, rather than the temperature reached by the polymer itself during crystallization.

More importantly, however, a central requirement of the claim is a particular relationship between crystallization temperature and polycondensation temperature, which is stated by the final phrase in the claim. Because the second step—"continuously polycondensing the crystallized granulate in said reactor while in contact with an inert gas stream at a temperature equivalent to, or lower than, the crystallization temperature"—expressly refers to a heating medium temperature, a proper comparison refers to the heating medium temperature in the first step as well. To ensure the proper relationship, the claim logically compares process conditions during crystallization to process conditions during polycondensation. Otherwise, the claim would compare granulate temperature during one phase of the process with heating medium temperature during another phase. Thus, the syntax of the claim suggests comparison of like entities to like entities—apples to apples, oranges to oranges, heating medium to heating medium.

The claim language alone, however, does not settle the claim interpretation issue. One of the parameters in the process sequence, namely "to a density of at least 1.390

g/cm3," specifies a property of the polymer, rather than of the heating medium. Moreover, on the point of comparison of like entities, a comparison of polymer temperature after crystallization to heating medium temperature during polycondensation, although syntactically unconventional, can be explained in terms of process chemistry. Thus, without manifest clarity in the claim language alone, this court consults other sources about the intended meaning of the claim language. *See E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433, 7 USPQ2d 1129, 1131 (Fed.Cir.1988).

The specification, of which the claims are part, teaches about the problems solved by the claimed invention, the way the claimed invention solves those problems, and the prior art that relates to the invention. These teachings provide valuable context for the meaning of the claim language. The specification states: "Polyethylene terephthalate ... was crystallized, using the apparatus described in the examples 1–18, at a temperature, $T_k$, of 235 ° [C] for a time, $t_k$, of 1.5 hours." '112 patent, col. 4, ll. 56–59. The specification uses the abbreviation $T_k$, or crystallization temperature, with apparent reference to the temperature of the heating medium. '112 patent, col. 6, ll. 66–68 ("The crystallization temperature $T_k$ was always *selected* to conform to the polycondensation temperature $T_f$.") (emphasis added).

Table 1 in the specification, however, is even more revelatory of the meaning of $T_k$, or the crystallization temperature. In showing the temperature values for various parameters and the corresponding presence or absence of "stickiness," Table 1 lists the crystallization temperature values for a sequence of samples in whole numbers, falling in increments of five or ten degrees. By recording temperatures in exact increments of 5 to 10 degrees, the table suggests that the crystallization temperature refers to the setting of the heating medium, rather than a precisely measured polymer temperature. The table apparently reports the dialed-in temperature settings of the heating apparatus, which would likely be selected in increments rounded to the nearest five degrees, rather than the temperature of the polymer which likely

would be measured and recorded with greater precision. Values for the polycondensation temperature, which is unquestionably a process parameter, also appear in exact increments of five to ten degrees. Thus, Table 1 points to $T_k$ as the temperature of the heating medium, not the granulate.

Again, however, the specification—though helpful—does not supply entirely conclusive proof of claim meaning. For instance, the specification also indicates: "that [t]he *granulate* was heated in the continuously operating mixer *to* the temperature values, $T_k$." '112 patent, col. 3, ll. 45–46 (emphasis added). This passage suggests that the granulate achieves the crystallization temperatures. Moreover the specification refers in another passage to the temperature of the heating medium separate from the crystallization temperature, '112 patent, col. 7, ll. 52–53, suggesting that the patent drafter knew how to refer to the temperature of the heating medium when he so intended. Thus, although the specification tends to support the trial court's claim reading, this court has cause to look further at other sources for the meaning of the claim language.

The administrative record of patent acquisition also supplies further context for the meaning of the claim language. During prosecution, Zimmer, the original assignee of the '112 patent, emphasized the invention's surprising results. In response to an office action, Zimmer noted that sticking "may be prevent[ed] if the polycondensation is preceded by a crystallization reaction *utilizing* temperature[s] which are higher than or equal to the temperature at which the solid state fixed bed polycondensation reaction is performed." In this passage, the term "utilizing" suggests the claims refer to the temperature of the heating medium rather than the temperature of the polymer. Zimmer used similar language throughout the prosecution history, with words like "used," "utilized," and "while heating at" the claimed temperature range. Further, Rothe submitted a drawing to the Patent and Trademark Office (PTO) that clearly shows a "hot oil jacket" at a temperature of 220 ° C to 260 ° C surrounding the crystallization chamber. Thus, the prosecution history supports the

conclusion that the temperature specified in the claims is the temperature of the heating medium. This conclusion also finds support the observation that the medium temperature is the only temperature that the operator can directly control during processing.

Again, however, the evidence from the prosecution history is not conclusive. In other parts of the administrative record, Zimmer distinguished the temperatures claimed in the patent from polymer temperatures in the prior art. Among other distinctions from the prior art, Zimmer argued that the polymer temperature in its invention decreases or stays the same upon entry into the polycondensation stage. In making this distinction, Zimmer apparently refers to polymer temperatures. In the prior art, a preheater preceded the polycondensation step. In the prior art Jaeger process, the preheater heating medium temperature is higher than at polycondensation, U.S. Pat. No. 3,756,990, col. 10, ll, 69–75, and in the prior art British Hoechst patents, the preheater heating medium temperature is approximately the same as at polycondensation, British Pat. No. 1,215,093. Thus Zimmer's temperature distinctions from prior art rely on polymer temperature, rather than heating medium temperatures. At no point, however, does the prosecution history show that Zimmer intended that the crystallization temperatures in its claim refer only to polymer temperatures.

■ Accordingly, the district court properly consulted extrinsic evidence relevant to claim meaning. As a general rule, the construing court interprets words in a claim as one of skill in the art at the time of invention would understand them. See *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1387, 21 USPQ2d 1383, 1386 (Fed.Cir. 1992). Therefore, the testimony of one skilled in the art about the meaning of claim terms at the time of the invention will almost always qualify as relevant evidence. Fed. R.Evid. 401; *Markman*, 52 F.3d at 981 (In "pronouncing the meaning of claim language as a matter of law based on the patent documents themselves ... the court is looking to the extrinsic evidence [i.e., testimony of one skilled in the art] to assist in its construction of the written document, a task it is required to perform."). If, of course, the meaning of the claims is clear from their language in view of the context provided by the specification and the prosecution history, the trial court should limit its consideration of extrinsic evidence. See *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583, 39 USPQ2d 1573, 1577 (Fed.Cir.1996). Extrinsic evidence—whether providing context for the claims or explaining claim meaning to one of skill in the art—cannot contradict claim language. *Id.* The trial court is best situated to gauge the relevance and need for additional evidence to explicate claim terms. See *International Communication Materials, Inc. v. Ricoh Co.*, 108 F.3d 316, 318–19, 41 USPQ2d 1957, 1958 (Fed.Cir.1997) (allowing the trial judge "to complete the picture" by developing a "more complete record").

As often occurs, each party presented experts vouching for their usage of the crystallization temperature limitation in the claim. According to the district court, Dr. Paul Phillips best reconciled these competing experts, and we agree. Dr. Phillips noted that the ordinary meaning of crystallization temperature in the field of polymer science is generally the temperature of the polymer undergoing crystallization, but the meaning of the term in the more specialized field of industrial chemical production is the temperature of the heating medium. Thus, in scientific writings focused on properties of a particular chemical, crystallization temperature often refers to the temperature of that chemical. Even Dr. Phillips used crystallization temperature to refer to the temperature of the polymer in such scientific writings. In technical writings about chemical processes and production methods, however, crystallization temperature generally refers to the temperature of the heating medium.

After a careful consideration of the entirety of the relevant evidence, the district court concluded and instructed the jury: "In this [first] step [of the claimed process], "220 ° C to 260 ° C" is the temperature of the heating medium and not the temperature of the granulate or polymer." Upon review of the entire record, and recognizing both the trial court's "trained ability to evaluate [expert]

testimony in relation to the overall structure of the patent" and the trial court's "better position to ascertain whether an expert's proposed definition fully comports with the specification and claims," *see Markman,* —— U.S. at ——, 116 S.Ct. at 1395, this court sustains the trial court's claim interpretation.

■ Indeed, the district court's claim interpretation is supported by a review of the 1993 reexamination, one of four reexaminations (three of which Goodyear requested in connection with this litigation) of the '112 patent at the PTO. The claims require that the PET granulate polycondenses at a temperature "equivalent to, or lower than, the crystallization temperature." '112 patent, col. 10, ll. 35–36. During the 1993 reexamination, the examiner's Reexamination Interview Summary Form stated that this claim language meant "not exceeding the initial crystallization temperature during further crystallization and after condensation." To the extent that the examiner's certificate purports to ascribe meaning not found in the claim language, this court must not permit prosecution history evidence to "enlarge, diminish, or vary" the meaning of claim language. *Markman,* 52 F.3d at 980. The claim language does not mention "initial crystallization" as distinct from "further crystallization." Nor did the 1993 reexamination require any changes in claim language.

■ In sum, the limitation in the examiner's statement does not appear anywhere in the claim language. The "initial" and "further" crystallization was apparently the examiner's way of distinguishing Jaeger which precrystallized some granulate before it entered the reactor for so-called "further crystallization" and polycondensation. Jaeger, however, does not disclose the temperature of its precrystallization, nor the critical '112 patent feature of holding the subsequent temperatures below that first crystallization step. Thus, without creating any additional limitations, as the examiner conceded by granting the reexamination certificate without any changes in claim language, the claims sufficiently distinguished Jaeger. Moreover, the examiner's statement might well render the claim inoperable. This court seeks to interpret claims to preserve, rather than defeat, their validity. *ACS Hosp. Sys., Inc. v. Montefiore Hosp.,* 732 F.2d 1572, 1577, 221 USPQ 929, 932 (Fed.Cir.1984). Thus, we affirm the trial judge's decision to exclude the limitation concerning "further crystallization" not found in claim language.

## Judgment as a Matter of Law

■ Having sustained the trial court's claim interpretation, this court next examines whether any jury could reasonably have found that Goodyear's accused CSS lines 1 and 2 literally infringe the '112 patent, as properly construed. *See Exxon Chem. Patents, Inc. v. Lubrizol Corp.,* 64 F.3d 1553, 1555, 35 USPQ2d 1801, 1802 (Fed.Cir.1995). Under the trial court's claim interpretation, the record contained sufficient evidence for a jury to find infringement by CSS lines 1 and 2. The record contains evidence that CSS lines 1 and 2 operate within the temperature ranges in the claim. Accordingly, this court affirms the trial court's denial of the defendant's motion for judgment as a matter of law of non-infringement for CSS lines 1 and 2.

## Antitrust Claims

Goodyear alleged that Eastman attempted to monopolize the container-grade PET market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 (1994), and violated Section 7 of the Clayton Act, *id.* § 18, by acquiring the exclusive right to enforce the '112 patent. The district court judge granted summary judgment in favor of Eastman on both of these counterclaims.

■ In determining whether the district court correctly granted summary judgment, this court applies the law of the regional circuit for this district court. *See Cygnus Therapeutics Sys. v. ALZA Corp.,* 92 F.3d 1153, 1161, 39 USPQ2d 1666, 1672 (Fed.Cir. 1996); *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 875, 228 USPQ 90, 99 (Fed.Cir. 1985) ("We must approach a federal antitrust claim as would a court of appeals in the circuit of the district court whose judgment we review."). The United States Court of Appeals for the Sixth Circuit reviews decisions granting summary judgment with mini-

mal deference. *See Kraus v. Sobel Corrugated Containers, Inc.,* 915 F.2d 227, 229 (6th Cir.1990). Thus, this court undertakes a similar review of these antitrust counterclaims. Additionally, this court need not agree with the trial court's reasoning in order to affirm its judgment. *See Fromson v. Advance Offset Plate, Inc.,* 755 F.2d 1549, 1556 (Fed.Cir.1985) ("This court reviews judgments, not opinions.").

■ Section 2 of the Sherman Act states: Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony.

15 U.S.C. § 2. In contrast, section 7 of the Clayton Act deals with "monopolistic tendencies in their incipiency and well before they have attained such effects as would justify a Sherman Act proceeding." *See Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. 104, 124, 107 S.Ct. 484, 496, 93 L.Ed.2d 427 (1986) (Stevens, J., dissenting) *(quoting* S.Rep. No. 1775, 81st Cong., 2d Sess., 4–5 (1950), U.S.Code Cong. Service 1950, p. 4293, 4296). Thus, section 7 may prohibit an acquisition, such as the acquisition of some patent licenses, if "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." *Id.* (quoting 15 U.S.C. § 18).

■ The Department of Justice, the Federal Trade Commission, state attorneys general, and private parties may enforce these regulations. Private parties may bring suit for violation of the Sherman Act and the Clayton Act under sections 4 (treble damages) and 16 (injunctive relief) of the Clayton Act. 15 U.S.C. §§ 15, 26 (1994). A private party, however, must meet certain standards to qualify for standing to sue under these provisions. One such requirement is that a private party must allege an "antitrust injury." *See Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334, 110 S.Ct. 1884, 1889, 109 L.Ed.2d 333 (1990); *Cargill,* 479 U.S. at 109–13, 107 S.Ct. at 488–91; *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697–98,

50 L.Ed.2d 701 (1977); *see also Axis, S.p.A. v. Micafil, Inc.,* 870 F.2d 1105, 1108–09, 10 USPQ2d 1849, 1852 (6th Cir.1989).

■ To satisfy the requirement of an antitrust injury, the party must allege and prove "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick,* 429 U.S. at 489, 97 S.Ct. at 697. The purpose of the antitrust injury requirement is to ensure that the harm for which the plaintiff seeks compensation corresponds to the rationale for finding a violation of the antitrust laws in the first place. *See Atlantic Richfield,* 495 U.S. at 342, 110 S.Ct. at 1893–94. This antitrust injury requirement further ensures that plaintiffs only recover if the loss is the result of "a competition-reducing aspect or effect of the defendant's behavior" rather than a competition-increasing or competition-neutral aspect of that behavior. *Id.* at 344, 110 S.Ct. at 1894–95. Thus, in order to overcome summary judgment, Goodyear must show that its claimed injuries reflect either the anticompetitive effects of the alleged violation or the effects of anticompetitive acts made possible by the alleged violation. *See HyPoint Tech., Inc. v. Hewlett–Packard Co.,* 949 F.2d 874, 877 (6th Cir.1992) (quoting *Brunswick,* 429 U.S. at 489, 97 S.Ct. at 697–98).

■ In this case, Goodyear alleges that Eastman acquired the rights to the '112 patent, despite its dominance in the PET market. Goodyear claims competitors in the PET market would experience anticompetitive effects from this acquisition, because Eastman's enforcement of the '112 patent—which was twelve years old and had never been enforced by Zimmer—would force competitors to either defend an infringement suit, seek a sublicense, or stop production and dismantle production facilities. Specifically, Goodyear alleges that it incurred expenses in defending this suit, that it spent additional funds negotiating an indemnification clause as part of the sale of its PET business, and, finally, that this suit caused Shell to pay less for Goodyear's PET production facilities. Goodyear did not allege any injury caused by an actual lessening of com-

petition, and, in fact, several Goodyear witnesses conceded that no such lessening of competition had taken place. The question becomes whether these allegations make out an antitrust injury sufficient to confer standing under section 4 or 16.

A sufficient antitrust injury must entail an "injury" within the meaning of sections 4 and 16, and this injury must be caused "by reason of anything forbidden in the antitrust laws." *Brunswick,* 429 U.S. at 488, 97 S.Ct. at 697; *see also Axis,* 870 F.2d at 1107. In *Brunswick,* the Supreme Court, in analyzing a section 4 claim for treble damages, found that the plaintiff lacked standing. *Id.* at 490, 97 S.Ct. at 698. Operators of bowling centers alleged that Brunswick, a giant in the bowling industry, violated section 7 of the Clayton Act by purchasing failing bowling alleys. *Id.* at 479–80, 97 S.Ct. at 692–93. Plaintiffs alleged that if these bowling alleys had gone bankrupt, their business and profits would have increased. *Id.* at 481, 97 S.Ct. at 693–94. Assuming that Brunswick had violated section 7, the Court concluded that the acquisitions did not cause the plaintiff's alleged losses, because the result would have been the same to the plaintiffs had any other solvent purchaser acquired the alleys. *Id.* at 487–88, 97 S.Ct. at 696–97; *see also Axis,* 870 F.2d at 1107–08 (discussing the *Brunswick* decision).

Similarly in this case, Goodyear has not alleged injuries caused "by reason of anything forbidden in the antitrust laws." Goodyear alleges injuries stemming from Eastman's enforcement of the '112 patent. Goodyear, however, would have suffered these same injuries regardless of who had acquired and enforced the patent against it. Indeed, Goodyear would have suffered these same injuries if Zimmer had retained exclusive rights to the patent and had enforced the patent against Goodyear itself. The cause of Goodyear's injuries was not that Eastman enforced the '112 patent, but that the patent was enforced at all. These injuries, therefore, did not occur "by reason of" that which made the acquisition allegedly anticompetitive. *See Brunswick,* 429 U.S. at 487, 97 S.Ct. at 697 (plaintiff "would have suffered the identical 'loss'—but no compen-

sable injury" if the disputed assets had been acquired by another party); *see also Axis,* 870 F.2d 1107–08.

As Goodyear—a private party—did not allege a sufficient antitrust injury, it lacks standing under sections 4 and 16 of the Clayton Act. Thus, this court affirms the district court's grant of summary judgment on the antitrust claims. We also affirm the district court's denial of Goodyear's misuse defense. Acquisition of and enforcement of a patent do not in and of themselves constitute patent misuse.

### State Law Counterclaims

The trial judge at first declined to exercise pendent jurisdiction of Goodyear's counterclaim under Ohio law for tortious interference with business. In response to Goodyear's motion to reconsider, the district court dismissed Goodyear's permissive state law counterclaim for a failure to establish venue.

28 U.S.C. § 1406(b) (1994) states:

(b) Nothing in this chapter shall impair the jurisdiction of a district court of any matter involving a party who does not interpose timely and sufficient objection to the venue.

Goodyear's First Amended Answer and Counterclaims alleged proper venue for the state law counterclaim. Eastman's reply admitted that venue was proper: "[P]laintiffs admit that complete diversity of citizenship exists between plaintiffs and Goodyear and that venue is proper pursuant to the cited sections." Because Eastman waived its right to object to venue, the trial court erred in dismissing Goodyear's state law counterclaim for failure of venue.

### Laches

This court reviews a district court's laches determination for an abuse of discretion. *See A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1039, 22 USPQ2d 1321, 1333 (Fed.Cir.1992) (in banc). This court may reverse a discretionary decision if that decision rests on an erroneous interpretation of law or clearly erroneous factual underpinnings. *See id.* Without such error, however, the district court's laches determination stands unless it evinces unreasonable judgment in weighing relevant factors. *See id.*

■ A six-year delay in filing suit after actual or constructive knowledge of the alleged infringement creates a prima facie defense of laches. *See Aukerman,* 960 F.2d at 1037. In this case, the district court judge found that the presumption of laches did not arise because Goodyear did not show that Zimmer knew or should have known of Goodyear's alleged infringement in 1978. The court based this finding on Zimmer's limited knowledge of Goodyear's processes, Goodyear's policy of maintaining the secrecy of those processes, Goodyear's assertion that its processes used Bepex technology, and Bepex's denial upon Zimmer's inquiry that the Bepex process infringed the Zimmer process. These findings are not clearly erroneous.

■ Without the benefit of the presumption, Goodyear has the burden to prove two elements of laches. First, Goodyear must prove that Eastman delayed filing suit an unreasonable and inexcusable length of time. *See Aukerman,* 960 F.2d at 1032. Second, Goodyear must also prove that the delay caused it prejudice or injury. *See id.* The trial judge found that Goodyear did not show either element. Zimmer's actions prior to the assignment of the patent rights are imputed to Eastman. A patentee cannot avoid the consequences of his laches by transferring the patent. *See Continental Coatings Corp. v. Metco, Inc.,* 464 F.2d 1375, 1377, 174 USPQ 423, 425 (7th Cir.1972); *Valutron N.V. v. NCR Corp.,* 33 USPQ2d 1986, 1989 (S.D.Ohio 1992), *aff'd without opinion,* 5 F.3d 1506 (Fed.Cir.1993); *see also* 5 Donald S. Chisum, *Patents* § 19.05[2][a][ii] (1995).

■ First, the delay begins when the plaintiff knew, or in the exercise of reasonable diligence should have known, of the defendant's allegedly infringing activity. *See Adelberg Lab., Inc. v. Miles, Inc.,* 921 F.2d 1267, 1270, 17 USPQ2d 1111, 1113 (Fed.Cir. 1990). Goodyear contends that Zimmer had constructive knowledge of the infringement because it did not exercise reasonable diligence to inform itself of Goodyear's infringement. Goodyear argues that Zimmer's customers gave it notice in 1978 of Goodyear's allegedly infringing activities and that Zimmer did not pursue these leads. The district court, to the contrary, specifically found that

Goodyear did not show that Zimmer knew or should have known of its alleged infringement. Due to Goodyear's policy of secrecy for the alleged infringement and its denial of infringement upon inquiry, this finding is not clearly erroneous. Thus, because Goodyear did not show one of the required elements for laches, the trial court did not abuse its discretion in denying this defense.

Moreover, the trial court did not, as Goodyear argues, focus solely on the defendants' acts to the exclusion of the plaintiffs' conduct. Rather the trial judge properly examined the defendants' action in maintaining secrecy and denying the alleged infringement as evidence of Zimmer's lack of constructive knowledge. *See, e.g., Fromson v. Western Litho Plate & Supply Co.,* 853 F.2d 1568, 1571, 7 USPQ2d 1606, 1610 (Fed.Cir.1988). While the defendant is correct that the proper focus of a laches inquiry should be "on the dilatory conduct of the patentee and the prejudice which the patentee's delay has caused," *Aukerman,* 960 F.2d at 1031–32, the trial judge was correct in considering the effect of Goodyear's secrecy policy on Zimmer's efforts to protect its rights.

### JMOL of Non-infringement of CSS Lines 3–8, 10 and 11.

Before giving the case to the jury, the trial judge entered judgment as a matter of law of noninfringement with respect to Goodyear's CSS lines 3–8, 10, and 11. The trial judge based this decision primarily on the claim limitation that the crystallization takes place under an "inert gas atmosphere." The trial judge determined that these lines do not infringe because the "inert gas" limitation does not include the heated air in the accused processes.

■ A grant of judgment as a matter of law under Fed.R.Civ.P. 50(a) is subject to *de novo* review. *See Burroughs Wellcome Co. v. Barr Lab., Inc.,* 40 F.3d 1223, 1227, 32 USPQ2d 1915, 1919 (Fed.Cir.1994). On appeal, this court applies the same standard as did the district court—examining the record in the light most favorable to the nonmovant and drawing inferences in its favor. *See id.* This court may affirm only if there is no

legally sufficient evidentiary basis for a reasonable jury to find otherwise, and, thus, that the judgment entered is the only one possible under the controlling law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Burroughs Wellcome,* 40 F.3d at 1227.

■ In making this determination, this court must first properly construe the claim language at issue. In this case, the claim interpretation question is whether the term "inert gas atmosphere" includes heated air. The district court determined that it does not. This court agrees.

The specification is particularly enlightening in reaching this conclusion. Initially, the "Summary of Invention" section of the '112 patent states:

> According to the present invention, prior to the start of the solid state polycondensation reaction, the granulate is crystallized ... in an inert gas atmosphere. The crystallized granulate is then transferred, at the same temperature or at a lower temperature, *while avoiding the addition of air,* to a continuously operating, fixed bed reactor....

'112 patent, col. 2, ll. 28–36 (emphasis added). This transfer is later described as taking place under "an airtight seal." '112 patent, col. 3, l. 51. This language suggests as well that the earlier crystallization phase should take place without air. Thus, the specification shows that air cannot make up the required "inert gas atmosphere."

Additionally, the specification states that "[e]levated oxygen and aldehyde levels are undesirable since they may cause discoloration of the end product," and that an oxygen content of less than 10 milligrams per kilogram (parts per million) and water levels of less than 250 milligrams per kilogram (parts per million) are preferable. '112 patent, col. 3, ll. 16–28. Indeed, in Examples 41–44, "it is evident that with [oxygen] concentrations of greater than 10 [parts per million] in the inert gas, severe discoloration of color in the granulate occurs." '112 patent, col. 6, ll. 53–56. By contrast, undisputed testimony revealed that the heated air used in Goodyear's lines contains 170,000 parts per million oxygen and 40,000 parts per million water.

Thus, because the specification requires that the "inert gas atmosphere" have limited amounts of water and oxygen, the specification supports the trial judge's claim interpretation that heated air—which contains large amounts of both oxygen and water—does not meet that limitation.

Turning next to the extrinsic evidence, numerous experts testified that PET is reactive with air under the conditions of crystallization, and one expert, who had not met with attorneys from either side and knew nothing about the issues in this case prior to taking the stand, testified that air is not an "inert gas" in this context. In light of the clear meaning of the specification, which finds adequate support from the extrinsic evidence, this court sustains the district court's claim interpretation.

■ Finally, we turn to the district court's application of this claim interpretation to the issue of infringement. Under this interpretation—that "inert gas" does not include Goodyear's heated air—the district court was correct in determining that CSS lines 3–8, 10 and 11 do not meet the "inert gas" limitation because they use only heated air. However, an accused device outside the literal meaning of the claims may still infringe by equivalents so long as each claimed element or its substantial equivalent is found in the accused device. *See Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* —— U.S. ——, ——, 117 S.Ct. 1040, 1049, 137 L.Ed.2d 146 (1997) (stressing the importance of applying the doctrine of equivalents on a element-by-element basis). A patentee may prove this insubstantial change by showing that the substituted element in the accused device performs substantially the same function, in substantially the same way, to produce substantially the same result as the claimed element. *See id.* at ——, 117 S.Ct. at 1054; *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). "It is important to ensure that application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety." *Warner–Jenkinson,* —— U.S. at ——, 117 S.Ct. at

1049; *see also Dolly, Inc. v. Spalding & Evenflo Cos.*, 16 F.3d 394, 398, 29 USPQ2d 1767, 1771 (Fed.Cir.1994) ("The doctrine of equivalents is not a license to ignore claim limitations."). In this case, the claim language specifically excludes reactive gases—such as "heated air"—from the scope of the claims. Therefore, CSS lines 3–8, 10, and 11 cannot infringe under the doctrine of equivalents. Thus, the trial judge correctly granted judgment as a matter of law of noninfringement with regards to these lines.

### Willful Infringement

Eastman contends that the trial court erred in issuing discovery and evidentiary rulings regarding two documents and in denying a proposed jury instruction allowing the jury to draw an adverse inference from Goodyear's refusal to produce documents. Thus, Eastman seeks a new trial on willful infringement.

■ This court reviews discovery and evidentiary rulings under an abuse of discretion standard. *See Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1547, 31 USPQ2d 1746, 1750 (Fed. Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1392, 131 L.Ed.2d 244 (1995). Eastman does not show an abuse of discretion.

■ A jury instruction ruling is subject to review for prejudicial legal error. *See Jamesbury Corp. v. Litton Indus. Prods.*, 756 F.2d 1556, 1558, 225 USPQ 253, 255 (Fed.Cir.1985). This standard means that Eastman "must demonstrate both that the jury instructions actually given were fatally flawed and that the requested instruction was proper and could have corrected the flaw." *Biodex Corp. v. Loredan Biomedical, Inc.*, 946 F.2d 850, 862, 20 USPQ2d 1252, 1261 (Fed.Cir.1991). Eastman requested the district court to instruct the jury that it could draw an adverse inference from Shell's failure to produce an opinion memorandum by its counsel, Mr. Jacminek.

This court has stated that failure to introduce an exculpatory opinion of counsel at trial may support an inference that such an opinion was either never obtained or was adverse. *See Fromson*, 853 F.2d at 1572–73. In this case, however, the trial court had the testimony of Mr. Jacminek. Mr. Jacminek testified about the noninfringement and possible invalidity of the '112 patent. Under these circumstances, the trial judge correctly refused to give Eastman's proposed jury instruction.

### III.

In sum, this court holds that the district court properly denied JMOL on the jury's finding of infringement by CSS lines 1 and 2. Additionally, the district court correctly dismissed the appellants antitrust counterclaims, correctly declined to apply the defense of laches, and correctly granted JMOL for noninfringement by CSS lines 3–8, 10 and 11. Finally, finding that appellants waived their right to object to proper venue, this court reverses the dismissal of Goodyear's state law counterclaims.

### Costs

Each party shall bear its own costs.

*AFFIRMED-IN-PART, REVERSED-IN-PART, AND REMANDED.*

LOURIE, Circuit Judge, dissenting-in-part.

I respectfully dissent from the court's decision to affirm the district court's judgment with respect to infringement by lines 1 and 2.

I do not agree that the claim limitation "crystallizing the granulate ... at a temperature of 220 ° C to 260 ° C" refers to the temperature of the heating medium. The claim is clear on its face, when read in light of the specification, that it refers to the temperature of the granulate. Thus, the court erred in its instruction to the jury concerning the meaning of the claim and in permitting the jury to rely on such extrinsic testimony as that given by Dr. Phillips.

When the granulate is crystallized "at a temperature," the granulate is *at that temperature.* I do not believe the specification is unclear on this point. Nothing in the patent, the prosecution history, or even the trial testimony indicates otherwise. The majority opinion, with great care, provides much analysis on this issue, but it is incorrect. Each of

the bases for its conclusion that heating medium temperature is intended is a speculative guess; the opinion repeatedly uses the words "suggests" and "apparently," whereas the references in the specification to the temperature of the material being acted upon are clear references to that material.

The summary of the invention indicates, '112 patent, column 2, lines 30–32, that the granulate is crystallized at temperatures of 220°C to 260°C. It then states that the crystallized granulate is then transferred at the same temperature to a reactor where it is polycondensed at a temperature equivalent to, or lower than, the crystallization temperature. It also states, at column 2, lines 56–58, that, according to a preferred embodiment, the crystallization is effected at a temperature of 230°C to 245°C. The specification also, at column 4, lines 33–35, makes a statement that the examples are "run at [particular] temperatures," indicating that the materials being treated are "at" that temperature. It is clear from the specification, consistent with conventional chemical terminology, that the temperature of the granulate is what is meant in each case.

The examples are similarly clear. At column 3, lines 46–47, the text of examples 1–18 states: "The granulate was heated in the continuously operating mixer to the temperature values, $T_K$, as indicated in Table 1...." When the granulate is heated to a temperature, it, not the heating medium, gets to that temperature. Examples 19–26, at column 5, line 14, refer to "temperature measurements." One obviously "measures" the temperature of the reactant rather than "setting" the temperature of a heating medium. Equally telling is this use of a symbol for the temperature of the substance undergoing crystallization, $T_K$, which the record shows conventionally means the temperature of the substance being crystallized. (Eastman's expert witnesses, Drs. Phillips and Gintis, as well as Goodyear's expert witness, Dr. Harris, each indicated that he and other polymer chemists generally use this symbol and the synonymous phrase "crystallization temperature" to refer to the temperature of the material undergoing the reaction.) *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980, 34 USPQ2d 1321, 1330 (Fed. Cir.1995) (in banc), *aff'd,* —— U.S. ——, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 USPQ2d 1461 (1996) ("[A] patentee is free to be his own lexicographer. The caveat is that any special definition given to a word must be clearly defined in the specification.") (citations omitted). At column 7, lines 22–23, examples 45–50, the specification states: "The crystallization temperature was 245°C. The solid state polycondensation temperature was 240°C." Nothing could be clearer; during crystallization and polycondensation the granulate was at those temperatures.

Nowhere in the description of the process in the specification is there reference to setting the temperature of a heating medium. The words "heating medium," constantly referred to in the majority opinion as the referent of the phrase "at a temperature" in the claims, do not appear in the portion of specification describing the claimed process. They only appear in the portion describing apparatus to measure granulate stickiness, *see* column 7, lines 52–53, which is not the invention and which it is a purpose of the invention to prevent, *see* column 2, lines 39–41. Even in this section, at column 8, lines, 31–32, the specification describes a temperature feeler which measures the granulate temperature to correlate it with granulate stickiness. This is distinctly different from the description of the process provided earlier in the specification, and the claims track the description of the process. I will not prolong this opinion by citing further places in the specification indicating that temperature references refer to the material being acted upon, not to the temperature of the heating medium.* Clearly the temperature is that of the granulate, not the heating medium.

The trial court and, regrettably, the majority of this panel, have simply been misled concerning what the specification clearly states and means. The analyses in the majority opinion leading to the contrary conclu-

---

* Not surprisingly, the prosecution history in reexamination also contains multiple references to the temperature of the granulate, including, *e.g.*, the passages: "the PET granules 'provide as much as a 10°C increase in their temperature ...'"; "the plastics material has been preheated to a temperature in the range ..."; and, "the granular material was preheated to 220°C...."

sion are not in my view convincing, even to show an ambiguity. The interesting analyses of sentence structure and the meaning of the words "at," "to," "under," "utilizing," and "used" prove nothing. They do not indicate that the temperature is not of the granulate. Likewise, granulate temperature is fully consistent with the five-degree increments in Table 1.

Given the clear meaning of "at a temperature," I believe that there is no need to resort to extrinsic evidence to resolve an ambiguity in the claim. The majority opinion acknowledges that extrinsic evidence cannot be admitted to contradict the claims, the specification, and the prosecution history. *See Markman v. Westview Instruments, Inc.*, — U.S. —, —, 116 S.Ct. 1384, 1395, 134 L.Ed.2d 577, 38 USPQ2d 1461, 1470 (1996) ("[A]ny credibility determinations will be subsumed within the necessarily sophisticated analysis of the whole document, required by the standard construction rule that a term can be defined only in a way that comports with the instrument as a whole."); *Trilogy Communications, Inc. v. Times Fiber Communications, Inc.*, 109 F.3d 739, 744, 42 USPQ2d 1129, 1133 (Fed.Cir.1997) ("[E]xtrinsic evidence may be relied on when needed to interpret claims, but only when it does not contradict the intrinsic record consisting of the claims themselves, the specification, and the prosecution history."); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584, 39 USPQ2d 1573, 1578 (Fed.Cir. 1996) ("[E]xtrinsic evidence in general, and expert testimony in particular, may be used only to help the court come to a proper understanding of the claims; it may not vary or contradict the claim language. Nor may it contradict the import of other parts of the specification.") (citation omitted). While correctly quoting the rule, the majority misapplies it. It has ratified the trial court's use of extrinsic testimony to contradict the specification.

However, even if extrinsic evidence such as Phillips's testimony is considered, it is ambiguous at best. Notwithstanding his admission of the common meaning of the phrase "crystallization temperature," Phillips stated that in the more specialized field of industrial chemical production someone of "ordinary skill in that art" would read that phrase as a "setting" for the heating medium. That contradicts the specification. One must read and rely on the specification, not invent categories of activity to which witnesses can assign different meanings for the same language. The patent teaches others of skill in the art how to make the claimed polymer, consistently using language meaningful to chemists; the claims track this language. It does not tell how to implement the fine points of industrial-scale techniques. It speaks to those who read the specification and carry out the claimed process, not to plant technicians.

Although proper interpretation of the claims as above is sufficient to result in a judgment for Goodyear, the majority opinion's interpretation of the meaning of the claim phrase "continuously polycondensing ... at a temperature equivalent to, or lower than, the crystallization temperature" is also wrong. As the majority opinion states, quoting from the Supreme Court's *Markman* opinion, — U.S. at —, 116 S.Ct. at 1395, 134 L.Ed.2d 577, 38 USPQ2d at 1470, this interpretation is based upon "the trial court's 'trained ability to evaluate [expert] testimony' ... and ... 'better position to ascertain whether an expert's proposed definition fully comports with the specification and claims.'" This language, while directed to the differences between judge and jury in *Markman*, is inapplicable here because the trial court's "trained ability" and "better position" to evaluate witnesses are irrelevant when reading the specification is what counts. The appellate court is equally well situated to read the specification. The majority opinion's claim interpretation is also based upon a reexamination examiner's distinction between an initial crystallization temperature and further crystallization in relation to prior art. This is irrelevant to the present infringement question because Goodyear's polycondensation occurred at a temperature greater than either crystallization step; therefore Goodyear could not infringe the claims, which require that polycondensation occur at an equivalent or lower temperature.

Given the proper claim construction, the trial court should have granted judgment as a matter of law that lines 1 and 2 do not infringe the '112 patent.

## ORDER

July 2, 1997.

A combined petition for rehearing and suggestion for rehearing in banc having been filed by the Appellant, and the petition for rehearing having been referred to the panel that heard the appeal, and thereafter the suggestion for rehearing in banc having been referred to the circuit judges who are in regular active service, it is ORDERED

that the petition is GRANTED for the limited purpose of making additions to the opinion.

[Editor's Note: Amendments incorporated for purpose of publication.]

It is further ORDERED that the suggestion for rehearing in banc is DECLINED.

The mandate of the court will issue on July 9, 1997.