CHARLES E. HILL & ASSOCIATES, INC., Plaintiff,

v.

COMPUSERVE, INC. and Compuserve Interactive Services, Inc., Defendants.

No. IP 97-0434-C M/S.

United States District Court, S.D. Indiana, Indianapolis Division.

April 9, 1999.

925

Donald E. Knebel, Barnes & Thornburg, Indianapolis, IN, for Plaintiff.

Thomas E. O'Conner Jr., Arter & Hadden, L.L.P., Columbus, OH, Jay G. Taylor, Ice Miller Donadio & Ryan, Indianapolis, IN, for Defendant.

Paul B. Overhauser, Jay G. Taylor, Ice Miller Donadio & Ryan, Indianapolis, IN.

Jeff Standley, Standley & Gilcrest, Dublin, OH.

## ORDER

McKINNEY, District Judge.

This matter comes before the Court following a hearing held to assist with construction of the claim language in the patent at issue in this infringement dispute. Guided by the Supreme Court in *Markman v. Westview Inst., Inc.*, 517 U.S. 370, 388–90, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) (*"Markman II"*), and the Federal Circuit in *Markman v. Westview Inst., Inc.*, 52 F.3d 967 (Fed.Cir.1995) (*"Markman I"*), the Court held a hearing on January 6 and 7, 1999, to receive and consider the parties' evidence and arguments with respect to disputed claim language. The two *Markman* cases authorize such a hearing, at which "extensive testimony" may be presented "on the various issues and arguments concerning the scope of the claims in the context of the accused structures." *See EMI Group North Amer., Inc. v. Intel Corp.*, 157 F.3d 887, 892 (Fed.Cir.1998). Specifically, *Markman I* held that, even in a case tried to a jury, "the court has the power and obligation to construe as a matter of law the meaning of language used in the patent claim." *Markman*, 52 F.3d at 979.

Patent litigation practice has evolved after *Markman* to include an early hearing on claim construction, sometimes independent of a dispositive motion, after which the parties obtain a ruling from the court regarding the meaning of disputed claim language. *See Mantech Env'l v. Hudson Env'l Serv.*, 152 F.3d 1368, 1375, n. 12 (Fed.Cir.1998) (noting the absence of evidence regarding the accused methods because the case terminated following the court's claim construction ruling); but *c.f. Cybor Corp. v. FAS Tech., Inc.*, 138 F.3d 1448, 1473 (Fed.Cir.1998) (Rader, J., dissenting) (questioning validity of court construing claims "unencumbered by the trial process"). Following the January 1999 hearing in this case, the parties submitted post-hearing briefs in which each presented its complete position with respect to claim construction and sought the Court's ruling on the meaning of the claim terms

and language in dispute. Not only have the parties here sought a resolution of their claim construction disputes prior to filing a dispositive motion, they have taken pains to avoid presentation of any evidence regarding the merits of the infringement claim. Instead, they seek a construction of the claim terms apart from any determination of the scope of the claims or whether they are infringed by the accused product.

Accepting this "procedural deviation" as an unavoidable consequence of *Markman I*, the Court will proceed with its analysis. *See Cybor Corp.*, 138 F.3d at 1474, n. 2 (Rader, J., dissenting) (providing an "incomplete list of procedural deviations required by *Markman I*"); *see also Id.* at 1479 (Newman, J., joined by Mayer, C.J., additional views) (noting difficulties that may flow from "premature claim interpretation"). The claim construction rendered herein will not be a "tentative one" subject to change upon receipt of additional information and evidence, but a definitive one based on all of the evidence of record at this point in the litigation. *See International Comm. Mat'ls, Inc. v. Ricoh Co., Ltd.*, 108 F.3d 316, 318–19 (Fed.Cir.1997) (noting that district court performed a "tentative construction" of the claim language to facilitate a decision of the preliminary injunction issue). Having been fully advised by the parties of their relative positions, the Court now turns to a discussion of the relevant legal rules and its own application of those rules to the patent in dispute.

## I. STANDARDS

### A. Claim Construction

When construing patent claims, a court must determine the meaning of the language used before it can ascertain the scope of the claims the plaintiff alleges are being infringed. *Markman I*, 52 F.3d at 979. In doing so, the court's interpretive focus is not the subjective intent of the parties employing a certain term, but the objective test of what one of ordinary skill

in the art at the time of the invention would have understood the term to mean. *Id.* at 986. When the court undertakes its duty of construing the claims, it first must look to the intrinsic evidence: the asserted and unasserted claims, the specification, and the prosecution history. *Id.* at 979; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996). Most of the time, such evidence will provide sufficient information for construing the claims. *Vitronics,* 90 F.3d at 1583.

■ The patent claims should " 'particularly point out and distinctly clai[m] the subject matter which the applicant regards as his invention.' " *Markman II,* 517 U.S. at 373, 116 S.Ct. 1384 (citing 35 U.S.C. § 112). During claim construction, the appropriate starting point for the court's inquiry is always the words of both the asserted and unasserted claims. *Comark Comms., Inc. v. Harris Corp.,* 156 F.3d 1182, 1186 (Fed.Cir.1998); *see Vitronics,* 90 F.3d at 1582; *see also Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1248 (Fed.Cir.1998). It is the claims, not the written description, that define the scope of the patent and accordingly, the patentee's rights. *Laitram Corp. v. NEC Corp.,* 163 F.3d 1342, 1347 (Fed.Cir.1998); *Markman I,* 52 F.3d at 970–71. As the Federal Circuit has recently noted, "[a]bsent a special and particular definition created by the patent applicant, terms in a claim are to be given their ordinary and accustomed meaning." *Renishaw,* 158 F.3d at 1249. The court further clarified that when there are several common meanings for a term, "the patent disclosure serves to point away from the improper meanings and toward the proper meaning." *Id.* at 1250.

■ A claim term will not be given a common dictionary meaning, however, if such a reading would be nonsensical in light of the patent disclosure, or specification. *Renishaw,* 158 F.3d at 1250. Accordingly, the correct claim construction is also the one that "stays true to the claim language and most naturally aligns with the patent's description of the invention." *Id.* That

description, or specification, serves an important purpose. In it, the patentee must provide a written description of the invention that would allow a person of ordinary skill in the art to make and use the invention. *Markman I,* 52 F.3d at 979. The applicable statute requires that "[t]he specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains ... to make and use the same...." 35 U.S.C. § ¶ 112, ¶ 1. Thus, to discover the correct meaning of a disputed claim term, the court must refer to the specification's description of the invention.

■ In addition, a patentee may be his or her own lexicographer and use terms in a manner different from their ordinary meaning. *Vitronics,* 90 F.3d at 1582. If the patentee chooses to do that, he or she must clearly state the special definition in the specification or file history of the patent. *Id.* The specification then serves as a dictionary when it defines terms, either expressly or by implication, that are used in the claims. *Id.* Therefore, it is also important to review the specification to discern whether the patentee has used a term in a way that is inconsistent with its ordinary meaning. *Id.* However, the specification should be used to clarify unclear claim terms, not to "trump the clear meaning of a claim term." *Comark,* 156 F.3d at 1187 (citing *E.I. du Pont de Nemours & Co. v. Phillips Petroleum,* 849 F.2d 1430, 1433 (Fed.Cir.1988)).

■ Claims must be read in light of the specification. *Markman I,* 52 F.3d at 979. However, limitations from the specification may not be read into the claims. *Comark,* 156 F.3d at 1186; *see also Laitram,* 163 F.3d at 1347. In particular, the court should not limit the invention to the specific examples or preferred embodiment found in the specification. *Texas Instruments, Inc. v. United States Int'l Trade Comm'n,* 805 F.2d 1558, 1563 (Fed.Cir. 1986); *see also Comark,* 156 F.3d at 1186.

Thus, the "repetition in the written description of a preferred aspect of a claim invention does not limit the scope of an invention that is described in the claims in different and broader terms." *Laitram,* 163 F.3d at 1348; *see also Electro Med. Sys. v. Cooper Life Sciences, Inc.,* 34 F.3d 1048, 1054 (Fed.Cir.1994).

Interpreting the meaning of a claim term "is not to be confused with adding an extraneous limitation appearing in the specification, which is improper." *Laitram,* 163 F.3d at 1348 (quoting *Intervet Am., Inc. v. Kee–Vet Lab., Inc.,* 887 F.2d 1050, 1053 (Fed.Cir.1989)). An extraneous limitation is a limitation added "wholly apart from any need to interpret what the patentee meant by particular words and phrases in the claim." *Hoganas AB v. Dresser Indus., Inc.,* 9 F.3d 948, 950 (Fed. Cir.1993); *see also Renishaw,* 158 F.3d at 1249. Although there is a fine line between reading a claim in light of the specification and reading a limitation from the specification into the claim, the court must look cautiously to the specification for assistance in defining unclear terms. *Comark,* 156 F.3d at 1186–87.

■ The third source of intrinsic evidence is the patent's prosecution history. *Vitronics,* 90 F.3d at 1582. In it the court will find a complete record of the proceedings before the Patent and Trademark Office leading to issuance of the patent. *Id.* The prosecution history contains both express representations made by the patentee concerning the scope of the patent, as well as interpretations of claim terms that were disclaimed during the prosecution. *Id.* at 1582–83; *see also Southwall Tech Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1576 (Fed.Cir.), *cert. denied,* 516 U.S. 987, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995). Although the prosecution history is useful for understanding claim language, it "cannot enlarge, diminish, or vary the limitations in the claims." *Markman I,* 52 F.3d at 979 (quotations omitted).

■ If, after reviewing all available intrinsic evidence, some genuine ambiguity still exists in the claims, the court may look to extrinsic evidence as an aid in construing the claim language. *Vitronics,* 90 F.3d at 1584. The Federal Circuit has made clear, however, that when the "public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper." *Id.* Moreover, compliance with the drafting requirements of § 112 should have eliminated any ambiguity in the claim language. "If the patent's claims are sufficiently unambiguous for the PTO, there should exist no factual ambiguity when those same claims are later construed by a court of law. ..." *Markman I,* 52 F.3d at 986. Given these drafting requirements, it would seem the court's need for extrinsic evidence is somewhat limited in scope.

■ Extrinsic evidence is any evidence outside of the patent and prosecution history, "including expert and inventor testimony, dictionaries, and learned treatises." *Markman I,* 52 F.3d at 980. It may be used to assist the court's understanding of the patent, or the field of technology, but not to vary or contradict the terms of the claims. *Id.* at 980–81. Judges are not usually "conversant in the particular technical art involved," or capable of reading the patent specification and claims as one skilled in the art might. *Id.* at 986. Thus, extrinsic evidence may provide needed information about the language used in the claims. *Id.* While extrinsic evidence can aid the court's understanding of claim language, it may not be used for the purpose of clarifying ambiguity in claim terminology. *Id.* When the court relies on extrinsic evidence to assist with claim construction, and the claim is susceptible to both a broader and a narrower meaning, the narrower meaning should be chosen if it is supported by the intrinsic evidence. *Digital Biometrics v. Identix,* 149 F.3d 1335, 1344 (Fed.Cir.1998).

■ As noted, even though the court may not rely on extrinsic evidence to resolve ambiguities, such evidence is often necessary to educate the court about the patent and the patent's relevant field of technolo-

gy. *Mantech,* 152 F.3d at 1373. This type of information can assist the court in overcoming an apparent ambiguity that stems from unfamiliarity with the terminology and the field of the invention, and to reach a "correct conclusion" as to the meaning of the claim. *Markman I,* 52 F.3d at 980 (citations omitted). Thus, it is entirely proper for the court to accept and admit extrinsic evidence, such as an expert's testimony, but then base its construction solely on the intrinsic evidence. *Mantech,* 152 F.3d at 1373.

Because it is the court's unfamiliarity with the patent's terminology and technology, and not the ambiguity of the terms, that allows for the admission of extrinsic evidence, the court must be cautious in using that evidence only as an aid in its endeavor to understand the terms. · *Markman I,* 52 F.3d at 981, 986. Accepting expert testimony about the relevant technology is proper; relying on expert testimony concerning the proper construction of a disputed claim may be improper. *Vitronics,* 90 F.3d at 1585. The Federal Circuit has, however, taken special note of the use by courts of another type of extrinsic evidence: dictionaries. In its *Vitronics* opinion, the court explained that although technical treatises and dictionaries are extrinsic evidence, judges are free to consult these resources at any time in order to get a better understanding of the underlying technologies. 90 F.3d at 1584 n. 6. The *Vitronics* court stated that judges may rely on dictionaries when construing claim terms as long as the dictionary definition does not contradict the definition found in, or ascertained by, a reading of the patent. *Id.*

### B. Section 112, ¶ 6

When construing the claims in question in the Hill patent, the Court must determine whether the claims are written in a step-plus-function form, an issue of dispute between the two parties. Once that determination has been made, the Court can properly construe the claim. If the Court finds that the patent used a step-plus-function claim element, the patentee is subject to the following statutory provision:

[a]n element in a claim for a combination may be expressed as ... a step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specifications and equivalents thereof.

35 U.S.C. § 112, ¶ 6. *See O.I. Corp. v. Tekmar Co., Inc.,* 115 F.3d 1576, 1583 (Fed.Cir.1997) ("element in combination method or process claim may be recited as a step for performing a specified function without the recital of acts in support of the function").

 This paragraph of § 112 "is implicated only when steps *plus function* without acts are present" in the claim. *O.I. Corp.,* 115 F.3d at 1583 (emphasis in original). Merely stating in the preamble of a patent claim the overall purpose of the process or method, and describing a series of steps to be performed to reach that result, does not convert each step into a step-plus-function element. *Id.* Unless the step is "individually associated" with a function to be performed by that step, it does not implicate § 112, ¶ 6. *Id.* Once a specified function is identified, however; the court looks to the specification to define the structure, materials or acts corresponding to the claimed function. 35 U.S.C. § 112, ¶ 6; *Sage Prods. v. Devon Indus. Inc.,* 126 F.3d 1420, 1428 (Fed.Cir.1997).

 In a means-plus-function format, the "means" term "is essentially a generic reference for the corresponding structure disclosed in the specification." *Chiuminatta Concrete Concepts v. Cardinal Indus.,* 145 F.3d 1303, 1308 (Fed.Cir.1998). Correspondingly, the term "step" refers to the "generic description of the elements of a process" or method, and the term "acts" refers to the "implementation of such steps." *O.I. Corp.,* 115 F.3d at 1583. By using this format, a patentee is allowed to claim a function without expressing all of

the possible means or steps of accomplishing that function. *Id.* "The price that must be paid for use of that convenience is limitation of the claim to the means [or acts] specified in the written description and equivalents thereof." *Id.*

Thus, a claim expressed in means- or step-plus-function language constitutes an exception to the rule that prohibits reading limitations from the specification into the claims. *Valmont Indus., Inc. v. Reinke Manuf. Co.,* 983 F.2d 1039, 1042 (Fed.Cir. 1993). For example, when dealing with a means–plus–function claim, specific alternative structures mentioned in the specifications, and equivalents thereto, delineate the scope of the patent. *See Serrano v. Telular Corp.,* 111 F.3d 1578, 1583 (Fed. Cir.1997). The alternative structures must be specifically identified, not just mentioned as possibilities, in order to be included in the scope of the patent. *Fonar Corp. v. General Elec. Co.,* 107 F.3d 1543, 1551 (Fed.Cir.), *cert. denied* 522 U.S. 908, 118 S.Ct. 266, 139 L.Ed.2d 192 (1997). Similarly, in a method or process claim, reciting a step-plus-function element subjects the claim to being limited by the acts specified in the disclosure, and their equivalents.

## II. DISCUSSION

The defendants, Compuserve, Inc. and Compuserve Interactive Services, Inc. (hereafter "Compuserve"), have pointed out that the parties offer different rules of claim construction. According to Compuserve, the disputed claim terms should be construed without reference to general dictionary definitions. Defendant also asserts that the court may limit claim definitions to the invention disclosed in the specification, the claims may be no broader than the supporting disclosures, and intrinsic evidence includes "confirming" inventor's testimony. The plaintiff, Charles E. Hill & Associates, Inc. ("Hill"), contends that Compuserve is trying to narrow the claims with extraneous limitations from the specification and the preferred embodiment, that the specification should be read to include details known in the art,

that the Court may consider extrinsic evidence, that the steps of a method claim may be performed in any order, and that the method steps in the claims at issue do not invoke § 112, ¶ 6.

■ Because claim construction is a question of law, and because no canon of claim construction is "absolute in its application," the Court will apply the canons it finds relevant and reasonable in each particular instance. *See Renishaw,* 158 F.3d at 1248. Of utmost importance to the process of construing claims is a consideration of the language of the claims in the necessary context. To learn that context, the court consults the patent specification, the prosecution history, expert commentary from those skilled in the art, and other relevant extrinsic evidence. *Eastman Kodak Co. v. Goodyear Tire & Rubber Co.,* 114 F.3d 1547, 1552 (Fed.Cir.1997). "Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Renishaw,* 158 F.3d at 1250 (citing *Markman II,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996)).

Thus, the Court will first review the purpose for the invention as described by the patentee in the specification, which entails an understanding of the problem identified in the prior art the inventor intended to solve. *Eastman Kodak Co.,* 114 F.3d at 1554. Crucial information about this problem is contained in the specification, in addition to descriptions of how the claimed invention solves it and the prior art that created it. *See Id.* "These teachings provide valuable context for the meaning of the claim language." *Id.* Next, the Court will examine each of the disputed terms from the Hill patent claims and construe them according to the context and the applicable rules of construction. The result will be a definition for each disputed term and ultimately a determination of the scope of the claim in which it is used. Finally, the Court will address the parties'

dispute about the order of the steps in the methods claimed by the invention.

## A. The Hill Patent

The patent in suit, for an electronic catalog system and method, is assigned to Charles E. Hill and Associates, by the inventor, Charles E. Hill (the "Hill Patent" or " '490 Patent"). Hill Patent at 1. It issued on June 18, 1996, following more than four years of prosecution in the Patent and Trademark Office. *Id.* The patented invention includes a combination of methods and corresponding apparatus whereby up-to-date information related to a selected product is transmitted from a main computer to a remote computer. '490 Patent, Abstract. It was designed "to reduce the problems associated with" the two common types of electronic catalog systems in existence at the time of the invention. *Id.,* Summary of the Invention, Col. 1, *ll.* 40–42. One, a "dial-up system," featured a remote computer at the customer's location, with a modem, and a main computer at the vendor's location. *Id.,* Background of the Invention, Col. 1, *ll.* 14–17. The remote computer would connect via the modem to the main computer, allowing the customer to log-on to the main computer and browse the catalog menu as a user of that computer. *Id., ll.* 17–19. When the customer selected a product for which more information was needed, the information about that product would be transmitted through the modem to the customer. *Id., ll.* 20–25. The problem with this system was that it took a large amount of time to transmit graphics data for the selected product over the modem, especially high-resolution graphics, which could not be transmitted "in a meaningful time frame." *Id.* Because of the length of time it took to transmit all of the information needed, the dial-up system was not practical for catalogs with text and graphics. *Id., ll.* 25–26.

The other prior art system did not involve any connection between the vendor and customer computers. *Id.,* Col. 1, *ll.* 27–36. Instead, the catalog was loaded onto the customer's computer from a disk, and periodically updated by the vendor sending new disks to the user. *Id.* Although the customer was able to view both text and graphics on his or her own computer, the disadvantage of this system was that the data was rarely up to date. "The accuracy of the data depends on the vendor sending updated data disks to the customer. In addition, the customer must also take the time to install the latest updated data disk onto his [or her] computer." *Id.* For these reasons—outdated information and delays and inconvenience involved with updating—the totally-resident catalog system was not a practical alternative.

Accordingly, the electronic catalog system of the '490 invention was designed to reduce the problems of delay, inconvenience, and outdated information associated with both of these prior systems. *Id.,* Summary of the Invention, Col. 1, *ll.* 40–45. It includes software on both the customer's (remote) computer and on the vendor's (main) computer that handles all communication between the two computers. *Id.* The two computers "cooperate" so that the customer is provided with accurate updated catalog information each time the system is used. *Id.,* Col. 1, *ll.* 45–50. A key feature of the patented system is that it "combines the techniques of a distributed data system with a parametric design system to minimize time required for a customer to access vendor's computer 12 on a real time basis." '490 Patent, Col. 9, *ll.* 30–34. Catalog data is stored on both the remote and the main computers, with all "constant" and "variable" data being stored and maintained on the main computer, and constant data being stored on the remote computer. *Id.,* Col. 3, *ll.* 11–14.

Variable data "is data that can change at any time." *Id.,* Summary of the Invention, Col. 1, *ll.* 53–54. If the variable data changes, the vendor "corrects the variable data entered into" the main computer, and it is automatically provided to the remote computer, "without the need to load new data disks onto the customer's computer."

*Id.*, Col. 1, *ll.* 65–67, Col. 2, *ll.* 1–2. "The customer's computer contains all constant data related to the catalog products." *Id.*, Col. 1, *ll.* 56–58. Constant data includes both graphics and text. *Id.*, *ll.* 58–59. When variable data is transmitted from the main computer to the remote computer, it is accompanied by a map that allows the remote computer "to integrate the variable data received ... with constant data related to the selected product stored in the customer's computer." *Id.*, Col. 2, *ll.* 17–22. It is a combination of "constant data residing on the customer's computer and variable data downloaded from vendor's computer" that merges to create a "completely updated data sheet for the selected product." *Id.*, Col. 2, *ll.* 23–25.

According to its summary, the Hill invention has three primary "objects," and ten "aspects." '490 Patent, Cols. 1–6. The objects of the invention include, 1) providing customers with instant access to the most up-to-date product information available; 2) minimizing computer online time; and 3) increasing system security. *Id.*, Col. 2. The ten aspects described in the specification correlate to the method and apparatus claims of the patent. *Id.*, Cols. 3–6. A key teaching of the Hill patent is that by partitioning information into "constant" data (which may include graphics) and "variable" data, the system can work more efficiently and quickly to provide accurate product information. *See Hill v. Compuserve, Inc.*, IP 97– 434, Jan. 6–7, 1999, Claim Construction Hearing Transcript (hereafter "Tr."), Vol. I, at 27–29. Both the constant and the variable data are stored and maintained on the vendor's main computer, and constant data is stored on the customer's remote computer. '490 Patent, Col. 1, *ll.* 51–55. When a customer wants to obtain information about a given product, he or she selects that product from a list that is resident on his or her computer. *Id.*, Col. 2, *ll.* 8–9. At this point the remote computer automatically calls the main computer and the catalog system compares the "revision status" of the constant data on the remote computer with the revision status of the constant data in the main computer memory. *Id.*, *ll* 10–14. If any of the remote computer's constant data is out of date, the main computer will automatically update it. *Id.*, *ll* 14–16.

Once the constant data has been updated the main computer transmits the variable data relating to the selected product and a map that permits the remote computer to integrate the variable data with the constant data stored in the remote computer. *Id.*, *ll.* 16–22. The customer's updated constant data and the incoming variable data are then integrated to create a data sheet for the desired product, containing the most up-to-date information available. *Id.*, *ll.* 22–26. Using this system provides a customer with "instant access to changes in variable data related to the products in the electronic catalog system." *Id.*, *ll.* 30–33. In this way, the invention's object of providing for the most up-to-date information about a product is achieved. *See Id.*, Col. 2, *ll.* 3–7.

Another object of the invention, minimizing computer "online" time, is accomplished by two elements of the invention: 1) the system controls when a customer logs on or off the main computer; and 2) normal browsing of the catalog is accomplished on the customer's computer, on which resides "all of the general catalog data." '490 Patent, Summary, Col. 2, *ll.* 41–56. Not only does this prevent a customer from logging on to the vendor's computer and not logging off, but graphics and other data that change infrequently will not have to be transmitted each time a customer wants to see a product's information, reducing on-line time by 70–80%. *See Id.*, Col. 2, *ll.* 55–59. The third object of the invention, increasing "system security," is accomplished because the invention's software controls when the remote computer logs on and off the main computer, which reduces customer access to the main computer. *Id.*, Col. 3, *ll.* 2–8.

Any effort directed at construing the meaning of claim language must contemplate the problems the inventor identified

in the prior art and the specific elements of the claimed invention designed to solve those problems. *See Eastman Kodak Co.,* 114 F.3d at 1554. The claims must be read in light of the entire specification, including the background of the invention and its objectives and purposes. *Id.; see also* Chisum on Patents, § 18.03[2][c][iv]. "The specification, of which the claims are part, teaches about the problems solved by the claimed invention, the way the claimed invention solves those problems, and the prior art that relates to the invention. These teachings provide valuable context for the meaning of claim language." *Eastman Kodak Co.,* 114 F.3d at 1554. However, the court should not "strictly limit a patent claim to the embodiments that fully achieve all the objectives." *Id.* (citing *Carl Zeiss Stiftung v. Renishaw,* 945 F.2d 1173, 1180 (Fed.Cir.1991)).

Meeting those objectives is a requirement for patentability, in that an invention must be considered "useful" to satisfy the utility requirement. *Stiftung,* 945 F.2d at 1180; *see* 35 U.S.C. § 101. The utility requirement derives from the Constitution, which provides that Congress may authorize the granting of patents "to promote progress of . . . . *useful* arts." U.S. Const. art. I, § 8, cl. 8 (emphasis added). Correspondingly, the Patent Act provides that patents may be granted only for inventions that are "new and useful." 35 U.S.C. § 101. In *Stiftung,* the court dealt with the issues of claim definiteness and utility when it noted that a properly-claimed invention that meets at least one stated objective satisfies the utility requirement. *Stiftung,* 945 F.2d at 1180. Thus, the '490 Patent's claim language will be construed in the context of the problems the invention was designed to solve and in a way that renders the claims "capable of being used to effect the object proposed." *Id.* (citing *Mitchell v. Tilghman,* 86 U.S. (19 Wall.) 287, 396, 22 L.Ed. 125 (1873)).

**B. Storing**

The '490 patent frequently uses the term "storing" in the claims and specifica-

tion. Hill suggests that the term should be given its "ordinary, well understood meaning of 'record[ing] (information) in an electronic device (as a computer) from which the data can be obtained as needed.' " Hill's Post–Hearing Brf. on Claim Construction (hereafter "Hill's Brf.") at 16. Compuserve, on the other hand, offers a more detailed definition of the claim term. According to Compuserve, storing means "permanently keeping it in a computer memory so that it is not deleted by the electronic catalog system. Such storing also does not mean storage in a cache memory." Def's Markman Post–Hearing Brief (hereafter "Def's Brf.") at 20. The gravamen of the parties' dispute about the meaning of this term is whether storing should include a period of time in which the information must be kept available. In other words, the question is whether storing must be defined to include a temporal element.

The Court finds that it does, given the objective of the invention, the context of the specification, and the import of both parties' proposed definitions. First, however, it is helpful to review the use of the term "storing" or "stored" in some of the claims at issue. Claim 1, which is an independent claim and one of the broadest, describes a method with seven steps, designated as follows:

> 1. A method for generating information related to a product, the method comprising the steps of:
>> *storing* and maintaining variable data and constant data . . . in a memory of a main computer. . . .
>> *storing* constant data related to the at least one product . . . in a memory of a remote computer. . . .
>> * * * * * *
>> * * * * * *
>> * * * * * *
>> updating constant data *stored* in the memory of the remote computer with constant data maintained in the memory of the main computer that is dif-

**934**

ferent from the constant data *stored* in the memory of the remote computer. . . .

'490 Patent, Col. 21–22 (emphasis added). The term is also used in Claim 10, which depends on Claim 1, and which is a method claim with three steps. It provides:

10. The method of claim 1, wherein the constant data updating step includes the steps of:

determining updated portions of the constant data *stored* in the main computer that are different than the constant data *stored* in the remote computer;

transmitting the updated portions of the constant data *stored* in the main computer from the main computer to the remote computer; and

replacing portions of the constant data *stored* on the remote computer with the updated portions of the constant data received from the main computer.

'490 Patent, Col. 22, Cl. 10 (emphasis added).

In the specification's summary of the invention, the term "storing" or "stored" is used to reflect the notion of data being "contained" on the remote and main computer. *Id.*, Col. 1, *ll.* 51–53 ("Catalog data is stored on both the vendor's computer and the customer's computer . . . . vendor's computer contains variable data"), *ll.* 56–58 ("customer's computer contains all constant data"). It is also used to suggest some degree of permanence, as when the summary describes the customer browsing "through general catalog data *residing* on the customer's computer." *Id.*, Col. 2, *ll.* 5–7 (emphasis added). Although the claim language differentiates between data that is "stored and maintained" on the main computer, but only "stored" on the remote, the Court finds that the distinction relates to the meaning of the term "maintain" and not to the word "store." *See* Col. 3, *ll.* 11–14. For example, both the specification and the claim language refer to constant data as being "stored" in the remote

and the main computers. When accurate product information is needed, the system automatically "updates" the constant data on the remote computer with constant data "stored" in the memory of the main computer. Col. 3, *ll.* 19–21; Col. 21, *ll.* 60–61; *see also* Col. 22, *ll.* 50–53 ("determining the updated portions of the constant data stored in the main computer"); Col. 23, *ll.* 17–20, Col. 23, *ll.* 45–46 ("updating . . . with constant data stored in the memory of the main computer"); Col. 22, *ll.* 35–38 ("constant data stored in the memory of the main computer and . . . in the memory of the remote computer includes both graphics data and textual data."). The use of the term "stored" when referring to data in both computers suggests that the data is expected to remain in the memory in which it is stored.

By reviewing the background and summary of the invention, the Court finds that "storing" suggests a temporal element in that, as long as a remote user wants to take advantage of the invention (*i.e.*, the distributed data electronic catalog system), constant data must be available on the remote computer. *See* Tr., Vol. I at 48 (agreeing that the data must stay on the main computer for the system to work). Otherwise, a customer could not reap the benefits of instant access to the most up-to-date product information available or minimize online computer time. Both of these objects would require the availability of constant data on the remote computer. Moreover, in considering the dictionary definitions of the verb "store," the Court notes a temporal element in many of the ordinary definitions, including the one proposed by Hill. In Hill's proposed definition, the phrase "data can be obtained as needed" connotes some degree of permanence or availability in that the data cannot be "obtained as needed" from a device that allows the data to be involuntarily deleted or removed. Plf's Ex. 104, citing Webster's New Int'l Dictionary of the English Lang. (3d ed.1993).

A second dictionary meaning offered by Hill declares that to store is "to leave or deposit in a store, warehouse, or other place *for keeping, preservation, or disposal*." *Id.* (emphasis added). Using an earlier version of that same dictionary, the Court notes alternative definitions of "to stock or furnish *against a future time*" and "to collect as a *reserved supply*." Webster's Third New Int'l Dictionary of the English Lang. (1981) (emphasis added). Another dictionary provides similar definitions: "to reserve or put away *for future use*" and "to deposit or receive in a storehouse or warehouse *for safekeeping*." American Heritage Dictionary (1976) (emphasis added). What each of these definitions has in common is the notion that the one who is doing the storing intends for it to be available for subsequent retrieval and use.

The full import of the ordinary meanings found in the cited dictionaries is consistent with the meaning that can be discerned in the patent claims and specification. A key aspect of the invention is that all catalog data will be kept on the main computer to be accessed by users of remote computers who need the latest product information. Tr., Vol. I at 28–29, 33, 51, Direct Testimony of Dr. Hubert E. Dunsmore, Jr. ("Dr. Dunsmore"). Claim 1 specifically refers to constant data on the main computer as being *stored*. '490 Patent, Col. 21, *ll.* 60–61 ("indicating revision level of the constant data stored in the main computer"). Another key aspect of the invention is that some data will be left on the remote computer to minimize the amount of time it takes later to obtain the most complete, up-to-date information about a product. Tr., Vol. I at 24–25 (explaining the technology of a "distributed data design"), 28 ("concepts in the Hill invention are to try to make it as efficient as possible so that information is available on the remote, or customer's computers, with a minimal amount of time required to transfer that from the main to the remote."); '490 Patent, Col. 2, *ll.* 22–33.

Another important concept in the patent is that the "constant data stored in the memory of the remote computer" will be updated "with constant data maintained in the memory of the main computer that is different from the constant data stored in the memory of the remote computer." *Id.*, Col. 22, *ll.* 5–8 (Claim 1). This step in Claim 1's method suggests that constant data be present in the memory of the remote computer so that it can be updated, and the language "that is different from" suggests a comparison between information stored in the memory of the remote computer and information in the memory of the main computer. For either of these steps to be useful, there must be constant data in the memory of the remote computer. Again, this language suggests that storing means more than just placing the data in a memory of the remote computer without regard for what happens to it. It suggests that the data remain there for some period of time.

Hill's proposed definition addresses this temporal notion with the phrase, "can be obtained as needed," but the wording leaves the definition vague and subjective. Essentially, Hill states that "storing" is a "simple word" with an ordinary, well-understood meaning. Hill's Brf. at 20. Nevertheless, Hill argues that because the claims use the word "storing" followed by "in a memory," the Court should eliminate the qualifying language "in an electronic device from which the data can be obtained as needed" to avoid any redundancy. Hill's Brf. at 21, n. 11. To do so, however, would eliminate the temporal element from the definition, which would be inconsistent with the meaning of the word in the context of the patent. The Court finds that the better definition for "store" is "to place or record in a storage device so that it will not be involuntarily removed or deleted." This definition varies the "ordinary" definition Hill proposed by refining the element of being able to obtain the information as needed—a refinement that is consistent with both the patentee's claimed objectives of instant access and minimizing on-line time, and the concept of a distributed data design.

Hill's claim construction theme has been that Compuserve is attempting to narrow the broad language of the claims with extraneous limitations from the specification, which is improper. In *Markman I*, the court identified two aspects of claim construction: 1) determining the meaning of the language in the claim; and 2) ascertaining the scope of the claim. 52 F.3d at 979. The rule against importing limitations from the specification into the claim relates more to the second step, ascertaining the scope of the claim, and not to the first, determining the meaning of a specific claim term. In *Renishaw*, the Federal Circuit reiterated the two familiar canons of claim construction cited frequently by the parties: 1) a court may not read a limitation into a claim from the written description; and 2) the court may look to the written description to define a term already in the claim limitation. 158 F.3d at 1248. When trying to determine the meaning of the term "when" in a disputed claim, the *Renishaw* court noted that the issue brought into "sharp focus the convergence of the two canons. . . ." *Id.* at 1251. On appeal, the patentee argued that the trial court erred by reading a narrowing limitation into "when" from the written description, while the defendant asserted that the meaning of the term "when" was "embedded throughout the specification." *Id.*

To resolve the dispute, the court reviewed the specification's description and the preferred embodiment, both of which described the mechanism in terms of an electrical signal occurring as soon as possible after contact between a probe and an object. Noting that the descriptions in the specification could not be read into the claims "without some hook," the court found the hook to be the term "when" in the disputed claim. *Id.* at 1252. The patentee's suggested meaning was found to be so broad that it would require the court to ignore "the abounding statements in the written description that point decidedly the other way." *Id.* Similarly, the claim language here uses a term that does not have a technical meaning in the applicable industry, yet has several common meanings, and one that provides a hook for reading the written description's intent into the claim. The written description shows that the invention is directed at providing the most accurate, up-to-date information available about a product in the least amount of time. It also specifically refers to the constant data as "residing" on the remote computer. Moreover, the whole point of distributing the data between the two computers is so that it would not take as long to transmit the information from the main computer to the remote. This would be defeated if the constant data being "stored" on the remote computer could be put in a memory where it could be involuntarily deleted.

If the relevant objects of the invention are to provide instant access to data and to minimize on-line computer time, then defining "storing" broadly enough to include temporary storage in random access memory ("RAM") or cache memory, both of which are temporary and subject to involuntary deletions, Tr. at 20, 43–44, 46, would be inconsistent with any of the invention's objectives. Instead, it is much more sensical, in light of the purpose and description in the specification, that the constant data be recorded with the expectation that it would remain until the user removes it of his or her own volition. In sum, the claim term "storing" means "recording in a storage device so that it will not be involuntarily removed or deleted."

## C. Maintaining

Given the definition just construed for the term "storing," it is obvious that the Court cannot accept the definition for "maintaining" offered by Hill, which is simply "preserving" or "keeping." Hill's Brf. at 22. As with the proposed definition for storing, Hill encourages the Court to drop the qualifying language from the ordinary dictionary meanings of the word "maintain." The dictionary meanings include "keeping in a state of repair, efficiency, or validity: preserving from failure or

decline." Hill's Brf. at 21 (citing Webster's Unabridged Dictionary). In support of its suggestion of abbreviating the dictionary meaning, the plaintiff points to the testimony of its expert witness at the hearing, Dr. Dunsmore, who used the term "maintain" interchangeably with "keep available." Tr., Vol. I at 48–50. Dr. Dunsmore also said that the definition of "keeping in existing state of repair, efficiency, or validity" works in the context of the patent. *Id.* at 49–50. His testimony clearly focused on the notion of keeping all of the catalog data available on the main computer, without any reference to the process for keeping it valid.

In the context of the patent, however, the idea of keeping the catalog data in a state of validity is equally important to keeping it available. The difference is in what is done to the data once it is stored in a memory. According to Dr. Dunsmore, the main computer "has the responsibility of always having the electronic catalog information available" so that remote computers may access it as needed. Tr. Vol. I, at 48. Yet, for the system to work that task is only one-half the responsibility. The main computer is also responsible for having all of the most up-to-date information for all catalog items. This idea is communicated in the claims by the description of a main revision status "indicating the revision level of the constant data stored in the main computer." '490 Patent, Col. 21, *ll,* 58–61. It is also conveyed by the step of updating the remote computer data "with constant data maintained in the memory of the main computer that is different from the constant data stored in the memory of the remote computer." *Id.* Col. 22, *ll.* 5–8.

With the latter claim limitation, the Court construes a different meaning for maintain than Hill's proposed definition of merely "preserving." This meaning is further supported by language from Claim 10, in which the "constant data updating step" involves "determining updated portions of the constant data stored in the main computer that are different than the constant data stored in the remote computer." '490 Patent, Col. 22, *ll.* 48–53. In fact, that step clarifies the difference between the claim term "maintaining" and the term "updating" in the context of this patent. "Maintaining" necessarily involves adding, modifying or deleting electronic catalog information stored in the main computer memory so that it reflects any changes the vendor wants to communicate to its customers. Otherwise, how would the data in the main computer memory be different from that in the remote? There is no step in the patent that provides for "updating" the catalog information held in the main computer memory. Nor is there any step that specifically provides for incrementing the revision level in the main revision status. Instead, these notions are expressed in the claim term "maintain."

This finding is reinforced in the claim covering the program aspects of the invention, in which one of the five steps involves "maintaining the latest revisions of the program and a main program revision status in the memory of the main computer." '490 patent, Claim 12, Col. 23, *ll.* 3–5. Claim 13, which depends from Claim 12, describes the step of "determining updated portions of the program stored in the main computer that are different from the program stored in the remote computer." *Id.* Col. 23, *ll.* 18–20. These two claims echo the relationship between Claim 1, in which variable and constant data are stored *and maintained* in the main computer memory, and Claim 10, in which the constant data updating step involves determining updated portions of the constant data "stored" in the main computer that is different than that stored in the remote computer. The difference is that with the program claims, there is a step that suggests what is meant by the concept of "maintaining." In Claim 12, "maintaining" encompasses the act of storing the latest revisions of the program and keeping them available.

Just because the Court finds Hill's proposed definition too limited to work in the context of the patent, does not mean that Compuserve's proposed definition

should be adopted. It is the court's responsibility to independently construe the claim terms, in the context of the claim language, the specification and the prosecution history—not merely adopt one proposed definition or the other. *See Markman I*, 52 F.3d at 979 ("the court has the power and obligation to construe as a matter of law the meaning of language used in the patent claim."). Compuserve suggests that "maintaining means that when constant data changes, the main computer is updated to reflect these changes, including incrementing the main constant data revision level." Def's Brf. at 23. That definition includes more detail than is necessary to accurately express the meaning of the word "maintain" in this patent.

In fact, Compuserve's proposed definition narrows the meaning of "maintain" to include only action taken in connection with constant data. Such a definition would contradict the first step listed in Claim 1, which describes "storing and maintaining *variable* data and constant data" in the main computer. '490 Patent, Col. 21, *ll.* 57–58 (emphasis added). It would also be inconsistent with usage of "maintaining" in Claim 12 in reference to "the latest revisions of the *program.*" *Id.*, Col. 23, *ll.* 3–5 (emphasis added). Compuserve is correct in identifying that the word "maintain" refers only to action taken with respect to data or programs on the main computer, yet this recognition does not dictate that maintaining means only updating constant data when it changes and incrementing the main constant data revision level. *See* Def's Brf. at 23. Instead, what is clear is that the act of "maintaining" is only taken with respect to data or programs contained in the main computer.

The specification provides that when changes in the variable data occur, those changes are entered into the main computer, '490 Patent, Col. 1, *ll.* 65–66, but it does not specifically describe the act of changing constant data and incrementing the main revision status to reflect such changes. Instead, it uses the word "maintain." Without a doubt, the act of changing

constant data in the main computer must have occurred for there to be differences between the constant data and revision status stored in the main computer and the constant data and revision status stored in the remote computer. Consequently, the claim term "maintaining" provides the "hook" for linking this concept to the claims. It must be defined so that it contemplates the act of revising constant data and incrementing the revision status, as well as keeping the results available. Because Claim 1 includes the step of "maintaining variable data and constant data," the term maintaining must also be defined to cover the act of revising variable data to reflect the latest information. This conclusion is further supported by the prosecution history, which described the vendor updating both constant and variable data on the main computer "immediately after change is made to a catalog item." Plf's Ex. 93, Prosecution History, Tab 6 at 4, Tab 9 at 6. Thus, the Court finds that the better definition for "maintaining" is "keeping the most current information available" for whatever item is designated.

Each time the word "maintain" is used in the patent, substituting the phrase "keep the most current information available" works without changing the idea being expressed in the sentence. For example, in Claim 1, substituting the phrase in the first step results in: "storing and [keeping the most current information available for] constant and variable data." The phrase adequately captures the notions about what happens to the data in the main computer. Changing the constant data to make it current is a necessary condition for there to be a revision status at the main computer reflecting the revision level of the data stored in the main computer, and for constant data in the memory of the main computer to be different from and useful for updating the constant data in the remote computer.

Claims 12, 27 and 33 refer to a step or means for "maintaining [keeping the most current information available for] the lat-

est revisions of the program." The specified step or means facilitates the language in the remainder of the claim referring to the program revision status and the step of updating the program stored in the remote with the program stored and maintained in the main computer. In either case, the meaning provided for this term by the Court works to convey the idea necessary to be consistent with the patentee's intention and the objectives of the invention: access to up–to–date information or reduction of computer on-line time. In sum, the appropriate definition for the claim term "maintaining" is "keeping the most current information available."

**D. Updating**

██ The patentee has used several terms in the patent claims that have similar connotations, including "storing" and "maintaining," both of which could be used to suggest the idea of "keeping." Another set of terms vulnerable to confusion is "maintaining" and "updating," either of which could encompass the concept of revising something. To discern the actual meaning in the Hill patent for any of these terms requires careful scrutiny of the context in which the term is used, and consideration of the broader context of the patent itself. The Court has just defined "maintaining" as "keeping the most current information available," which then must be distinguished from the word "updating." Although both terms involve the idea of incorporating revisions, "maintaining" refers to keeping information in a certain state or condition, while "updating" refers to the actual process of bringing data, files, or programs up-to-date.

In the Hill patent, "maintaining" is used only in connection with data or programs on the main computer, and it implies a volitional act, whereas "updating" occurs only with respect to the data or programs on the remote computer, and implies a system-generated activity. The file history makes this point in remarks about an amendment made to "more particularly point out" that constant data stored on the remote computer is a subset of the product

information data in the electronic catalog. *See* Plf's Ex. 93, Tab 9, at 5. When discussing the product selection process, the patentee described the updating of constant data on the remote computer as "automatic." *Id.* at 6. Specifically, the patentee declared that "[t] he customer never has to request an update of constant data." *Id.* These passages are in response to an Official Action dated May 23, 1994, in which the examiner rejected claims 1–6, 9–19, 22, 24–29, 32–64, 66–71, and 73–74, based on obviousness in light of prior art. *Id.*, Tab 7 at 3. The examiner had noted that the Waite patent taught the "inherent step" of storing and maintaining a main revision status in the main computer to indicate the revision level of constant data stored therein. *Id.* at 4. In this prior art reference, such information was necessary to allow a remote user to request the correct revision level of a particular product. *Id.* It was in response to these objections that the patentee represented that in his invention updating of constant data on the remote computer was never at the request of the customer. Thus, the prosecution history supports a finding that "updating" involves the idea of an automatic process.

The patent also describes "updating" as a process of transmitting revised data or programs from the main computer to the remote computer, while "maintaining" refers to action taken only at the main computer. In a network of computers, when there is a main or host computer and one or more remote computers, a hierarchy is created. *See* Tr., Vol. I at 25–26, 34. By only referring to the process of "updating" as a transmission of information from the main computer to the remote, the Hill patent recognizes that hierarchy. *See Id.* at 28, 34. Updating involves an automatic transmission of portions of the revised data or programs from the main computer (where the latest program revisions and all data is maintained) down the hierarchy to the remote computer (where such things are only stored). The Court finds that "updating" is also distinguishable from "maintaining" by these features—the locus

of each activity within the network hierarchy and the automatic nature of the process of "updating."

According to Hill, the ordinary definition for "updating" is simply "bringing up to date," and although technical definitions may be found, they are consistent with this proposed ordinary definition. The technical definitions presented at the hearing include, "in database management, a fundamental data manipulation that involves adding, modifying, or deleting data records so that data is brought up-to-date." Webster's New World Dictionary of Computer Terms. Hill's expert testified that this is the meaning that would be understood by one of ordinary skill in the art. Tr., Vol. I at 78–79. Similarly, another technical dictionary defines "update" as, "to change a system or a data file to make it more current." Microsoft Press Computer Dictionary. Compuserve's proposed definition includes several other elements: "bringing up to date all of the constant data files of the electronic catalog stored on the remote computer by transmitting in a single transmission containing the constant data files necessary for synchronization so that a complete copy of all of the most current constant data files are [sic] stored on the remote computer." Def's Brf. at 25.

In support of this definition, Compuserve cites passages from the description of the preferred embodiment relating to the step of comparing the remote and main program and constant data revision statuses. '490 Patent, Col. 18, *ll.* 47–51. The passages refer to a process in which "all the updated files are compressed into a single update file" and sent from the main computer to the remote computer. *Id., ll.* 59–62. The "single update file is then downloaded" onto the customer's computer in response to an update request. *Id., ll.* 62–64. From this, Compuserve concludes that the claim term "updating" must mean the process of transmitting all updated files, which have been compressed into a single update file, and that "all" means every constant data file for the entire electronic catalog system that has changed

since the last time the remote computer accessed the catalog.

In another passage, the circumstances are discussed under which the constant data and software on the customer's computer are more than one revision level behind those on the main computer. In that case, "all of the files for all of the revisions that the customer requires to become updated are compressed into a single file and downloaded." '490 Patent, Col. 19, *ll.* 26– 31. Compuserve deduces from this passage further support for its contention the patent requires that all of the changed constant data be transmitted to the remote computer and synchronized. Def's Brf. at 27. At no point does Compuserve address the language in the actual claims, or attempt to construe the term "updating" in that context. Nor does Compuserve refer to the summary of the invention in the specification for any guidance as to the meaning of this claim term.

Based on the cited passages alone, the Court is not satisfied that Compuserve has demonstrated that the patentee created a "special and particular definition" for "updating" that is more specific than the ordinary technical or dictionary meanings. In fact, Compuserve's proposed definition specifically refers to constant data, whereas the claims use "updating" in connection with both constant data *and program files.* It also imports the "single transmission" limitation found in the preferred embodiment into the definition of a broader claim term, which is improper. *See* '490 Patent, Col. 18, *ll.* 59–62; *Mantech,* 152 F.3d at 1374; *SRI Int'l v. Matsushita Elec. Corp.,* 775 F.2d 1107, 1121 (Fed.Cir.1985). For these reasons, the Court will not adopt the single transmission of all constant data element of the proposed definition of the defendant.

This decision, however, does not end the inquiry. Both parties have presented arguments about whether "updating" means that all of the revised data and program files on the main computer must be sent each time updating occurs. Compuserve

contends that updating means transmitting all of the most current constant data files on the main computer to the remote. Hill opposes Compuserve's definition by arguing that the word "all" does not appear in the claim language, and that adding it to the definition of updating would thus be improper. According to Hill, the only revised data used for the updating step is the data needed for the specific task to be performed. This argument misses the point. It is the word "updating" that the Court must construe, and the question is whether that term should be defined to include the limitation that all revised data and program files on the main computer be included with each update. Answering that question requires the Court to further examine the claims and the specification for relevant textual clues.

In the summary of the invention, the constant data updating step is described as including the step of "determining *updated portions* of the constant data stored in the main computer *that are different than* the constant data stored in the remote computer," transmitting those "updated portions," and "replacing portions of the constant data stored on the remote computer with the updated portions ... received from the main computer." '490 Patent, Col. 3, *ll.* 64–67, Col. 4, *ll.* 1–5 (emphasis added). In another passage, the patentee refers to the method of "automatically" updating a program on a remote computer. *Id.,* Col. 4, *ll.* 22–24. A part of that method includes the step of "updating portions of the program" in the remote computer *that are different from* the program in the main computer. *Id., ll.* 35–37 (emphasis added). A similar pattern of language is used for an illustration of the updating step, each time referring to portions of data that vary from the data on the remote computer. *Id.,* Col. 4, *ll.* 40–48. What this language does is point the way to a determination of what data will be included in an update: the data that is different from what is stored on the remote computer.

Such a limitation is born out in parallel language in the claims. Specifically, Claim 1's updating step calls for updating the constant data in the remote computer "with constant data maintained in the memory of the main computer *that is different from* the constant data stored in the memory of the remote computer." '490 Patent, Col. 22, *ll.* 5–8 (emphasis added). In Claim 15, the updating step uses similar language, updating "with constant data stored in the memory of the main computer *that is different from*" that stored in the remote computer. *Id.,* Col. 23, *ll.* 45–48 (emphasis added). Although these passages suggest that Hill's argument about the transmission of less than all revised files might be correct, their significance in relation to the meaning of the claim term "updating" cannot be understood without consideration of other language in the claims.

When a transmission of data relating only to the specific task to be performed by the remote computer is described in the specification or the claims, the modifier "related to" is used. For example, Claim 1 calls for "transmitting variable data *related to* the at least one product" from the main to the remote computer. '490 Patent, Col. 22, *ll.* 9–11 (emphasis added). Further, in Claim 15's transmitting step, the method calls for transmitting "variable data *related to* the selected product" from the main to the remote computer. *Id.,* Col. 23, *ll.* 49–50 (emphasis added). The integrating step in Claim 15 uses similar language to represent this concept. It requires "integrating constant data stored in the memory of the remote computer *associated with* the selected product with the variable data...." *Id.,* Col. 23, *ll.* 51–53 (emphasis added). In Claim 1, the integrating step requires "integrating constant data *related* to the at least one product...." *Id.,* Col. 22, *ll.* 12–13 (emphasis added). By using this modifier in the patent claims to indicate the intent to limit the operation being performed to the data needed for the specific task initiated by the customer, the patentee demonstrated that he did not intend to so limit the operation performed on data without the modifier. Thus, Hill's conten-

tion that "updating" means transmitting less than all of the revised files or data from the main·computer to the remote is not supported in the context of the claims.

Having said this, the question of whether the claim term "updating" should be defined to limit it to a transmission of all the revised data or files on the main computer would seem to be answered. It is not. The reason for this is that the question of whether all or only a portion of the revised files would be transmitted during updating is answered in the claim itself, and the answer need not become a limitation in the definition of the term "updating." As the Court has noted, the claim language makes clear that the constant data or programs from the main computer to be used for updating the remote computer will be those that are *different from* the constant data or programs stored in the remote computer. Because the constant data stored in the remote computer is a "subset of information data related to the at least one product," it is conceivable that only a subset of all the revised data on the main computer would be transmitted during an update.

By limiting the claim term with respect to how much constant data would be transmitted, the Court would effectively remove that possibility from the claimed invention. That is not necessary. The Court has not accepted the invitation of the parties to interpret the scope of the claim at this point in the litigation. Rather, it is accepting the *Markman* invitation to define the individual claim term. It is in the interpretation of the scope of the entire updating step that the Court will address the issue of whether all revised data or files must be transmitted, not during the *Markman* process of construing individual claim terms.

When construed in the context of the other steps in the method claim and the specification, the word "updating" cannot be defined as including a limitation that all revised constant data on the main computer be sent with each transmission. Nor is it adequately defined for purpose of this pat-

ent by the phrase "bringing up to date." Thus, the Court finds that the term "updating" should be defined as "an automatic process of adding, modifying, or deleting data records or program files to bring the remote computer uptodate." This definition is consistent with the cited technical dictionary definitions, and "stays true to the claim language and most naturally aligns with the patent's description of the invention." *See Renishaw,* 158 F.3d at 1250.

### E. Integrating

The primary dispute between the parties with respect to the claim term "integrating" involves whether it should be defined to include the particular method of integrating suggested in the preferred embodiment. Specifically, the dispute is about whether its definition should require a map file and X, Y coordinates for positioning the constant and variable data related to the selected product. Def's Brf. at 29. Hill argues that the term "integrating" as used in the Hill patent should be given its ordinary meaning of "merging." Hill's Brf. at 37. Compuserve, on the other hand, proposes the definition of "positioning the contents of constant data files and variable data files according to X, Y coordinates specified in a map file." Def's Brf. at 29. Citing the description of the preferred embodiment, Compuserve argues that the Hill patent "emphasizes the *mandatory* nature of the map file and its X, Y positional contents." *Id.* at 30. In addition, the defendant asserts that the integrating step is written in "stepplus-function" format, invoking § 112, ¶ 6, and requiring that the step be accomplished using the acts recited in the specification or their equivalents.

The Court will address the latter contention first. The text of this disputed claim is as follows:

integrating constant data related to the at least one product with the variable data related to the at least one product in the remote computer *to generate the*

*information data* related to the at least one product including both constant data and variable data.

'490 Patent, Col. 22, *ll.* 12–16 (emphasis added). Although Compuserve failed to identify the function this step is supposed to perform, the Court has italicized the language in the step that might fill this requirement. *See O.I. Corp.*, 115 F.3d at 1583 (unless step is "individually associated" with a function to be performed by that step, it does not implicate § 112, ¶ 6). The emphasized text, however, does not recite a specific function with which this step is associated. Instead, it is a repetition of the statement of purpose for the overall method that is recited in the preamble of the claim, which does not constitute a function for the steps that follow. *Id.* The preamble for Claim 1 recites "[a] method for generating information related to a product...." '490 Patent, Col. 21, *ll.* 55–56. Thus, § 112, ¶ 6 does not require that the Court limit "integrating" to the acts recited in the specification or their equivalent.

With respect to the "mandatory nature" of a map file, the Court does not agree. The claim does not state that the integration step is to be accomplished in accordance with some instructions located either on the main or the remote computer. It is only in the dependant claims that the idea of using a map file for positioning the data during the integration step is introduced. According to the testimony of Dr. Dunsmore, one of ordinary skill in the art would know various ways of integrating data to create a meaningful computer display. Tr., Vol. I at 96. Dr. Dunsmore summarized his definition of integrate as "bringing together the various types of data, constant data and variable data, and placing them in the viewing area so that they are meaningful and functional to the person requiring information from the electronic catalog." *Id.* at 99.

Although Dr. Dunsmore agreed that "merging" would be a synonym for this process, the Court finds that merging does not constitute an adequate definition of the word "integrate." This is because the in-

tention of the inventor is to provide the customer with instantaneous access to the most up-to-date product information and to reduce on-line computer time. The latter objective is not pertinent to the integration step, because that step seems to be performed only on the remote computer. Thus, the Court finds that to provide instantaneous access to the most current product information, that information must be displayed for the customer in a meaningful and functional way. It also must be composed of the constant and variable data, which are key components of the distributed data design catalog system. The only mechanism for accomplishing this is the integrating step, which merges the constant data and variable data related to the selected product to generate the information data. For this reason, the Court construes the meaning of the claim term "integrating" to mean "merging or uniting in a meaningful way," which works when substituted in the claim as follows:

> [merging or uniting] constant data . . . with the variable data . . . in the remote computer [in a meaningful way] to generate the information data . . .

'490 Patent, Col. 22, *ll.* 12–14.

## F. Constant and Variable Data

A key aspect of the Hill invention is the notion of distributing the data needed to obtain complete information about a product on two different computers, the main computer, which contains all of the product information data for the electronic catalog, and the remote computer which holds a subset of that data. This is the essence of the distributed data design technique employed by the inventor to accomplish his design objectives. Two of the three stated objectives of the invention are met by using this system. First, the objective of providing the customer "with an instantaneous distribution of the latest catalog data available" is met because the main computer is responsible for keeping all of the most current data and transmitting the requested data along with any changes to constant data each time a customer seeks

information. This feature meets the "latest catalog data available" element. The "instantaneous distribution" element is met because a subset of the catalog data is kept on the remote computer, which reduces the amount of data that must be transmitted when a customer requests product information.

Second, the objective of minimizing "computer on-line time" is met by the distributed data design for the same reason the instantaneous distribution element is met. Keeping a subset of catalog data on the remote computer, which can be easily updated by the main computer transmitting updated portions of data automatically, allows for less time online receiving data. The patent teaches that the data classified as constant and kept on the remote computer may include the type of data files, such as graphics, that take a long time to transmit. *See* '490 Patent, Col. 1, *ll.* 20–25 (describing disadvantage of prior art "dial-up" electronic catalog system); *see also* Plf's Ex. 93, Tab 4 at 4; Tab 6 at 3–4; Tab 9 at 5–6.

The parties disagree about the construction of the claim terms "constant" and "variable" data, with Compuserve proposing a definition that contains many elements and Hill proposing a much simpler one. Compuserve's proposed definition of "variable data" is:

> "Variable data" is product data: (a) that has been classified by the vendor, before operation of the system, as being more likely to change than constant data; (b) is in a file that relates to only one product; (c) that is transmitted to a remote computer after transmission of all constant data; and (d) for which the main revision status level is not incremented when a new variable data filed is changed or updated.

Def's Brf. at 13. According to Compuserve, the four attributes of this definition are required by the Hill patent specification.

◼ The Court finds that "variable data" is adequately defined in the specification itself, and declines Compuserve's invitation to add the four proposed limitations to that definition. In the summary of the invention, variable data is defined as "data that can change at any time." This definition corresponds with ordinary dictionary meanings for the word "variable." For example, one dictionary defines "variable" as "liable or likely to change or vary; subject to variation; changeable; inconstant." American Heritage Dictionary (1976). Another provides a similar definition: "able or apt to vary or change; characterized by variation or by varying." Webster's Third New International Dictionary. Moreover, each time the term "variable data" is used in the patent, this definition could be substituted with no change in the meaning of the sentence. For instance, in Claim 1 the method recites the step of "transmitting variable data [data that can change at any time] related to the at least one product from the main computer to the remote computer." '490 Patent, Col. 22, *ll.* 9–11. Similarly, the summary of the invention states "a combination of constant data residing on the customer's computer and variable data [data that can change at any time] downloaded from the vendor's computer is integrated and merged to create a completely updated data sheet...." *Id.*, Col. 2, *ll.* 22–25.

◼ It is the patent's use of the claim term "constant data" that conveys a slightly different meaning than the ordinary dictionary meaning. One dictionary definition is: "unchanging in nature, value or extent; invariable." American Heritage Dictionary. A second definition is: "something that does not vary or change in its relationship with other things; fixed and invariable; remaining unchanged." Webster's Third New World International Dictionary. In the context of the Hill patent, however, "constant data" does not mean data that does not change. That is clear from the fact that the main computer stores and maintains a "main revision status," which is described as "indicating the revision level of the constant data stored in

the main computer." '490 Patent, Col. 21, ll. 58–61. Another step describes a similar revision status that indicates the revision level of the constant data stored in the remote computer. *Id., ll.* 65–67. Finally, the updating step specifically establishes that "constant data maintained" on the main computer could be different from the constant data stored on the remote computer. The prosecution history also supports a finding that "constant data" is expected to change. *See* Plf's Ex. 93, Tab 4 at 4; Tab 6 at 3–4; Tab 9 at 5–6. By clear implication, the "constant data" to which the patent refers must undergo changes.

Hill's suggested definition for "constant data" is: "product information likely to change less often than variable data." Hill's Brf. at 27. Compuserve, on the other hand, proposes a definition for constant data as follows:

> "Constant data" is product data: (a) that has been classified by the vendor before the operation of the system, as being less likely to change than variable data; (b) that can be related to more than one product; (c) that is transmitted to a remote computer before the transmission of any variable data; and (d) for which a main revision status level is incremented when a new constant data file is changed or updated.

Def's Brf. at 13. Both parties agree that constant data is "less likely to change than variable data." They disagree, however, about whether the definitions for constant and variable data must include a statement regarding who classifies product information into the two subsets of data. They also dispute defining variable data as relating to only one product and constant data to more than one product, as well as including the order in which the data is transmitted and whether a main revision level is incremented when the data is changed in the definition.

According to Compuserve, these attributes must be included in the definitions for constant and variable data so that the Court will be able to apply the definitions later in the case to determine whether infringement has occurred. Def's Brf. at 19. To make that determination, Compuserve asserts, the Court would be required to classify data as either constant or variable. *Id.* The apparent premise for this conclusion is that the Court will be presented with a list of data files and asked to determine which are constant and which variable. However, the patent does not include any step that describes classifying data. Instead, the invention assumes data is already classified and then describes the operations performed on or with that data. If the Court were to add elements to the definitions of constant or variable data that limit who classifies it, how it is to be classified, and when, the Court would be doing more than construing claim terms, it would be adding claims. The proposed additional limitations exceed the scope of the claimed invention.

Compuserve points to illustration figure 1B, showing the distribution of data and software programs on the vendor's computer, as supporting the disputed elements. That figure depicts constant and variable data being stored separately in the memory of the main computer. While this may be true, that fact alone does not require the Court to define constant or variable data in terms of who classifies it or when. Compuserve cites portions of the prosecution history in further support of adding this element to the definition. Specifically, Compuserve points to Hill's original specification and states that "Hill told the Patent Office that constant data and variable data are already classified as depicted in Fig. 1B" on page 12, lines 15–17. Def's Brf. at 14 (citing the Original Specification, Apr. 10, 1992, *see* Plf's Ex. 93). The only communication the Court can discern from that citation is a description of Figure 1B as "a block diagram illustrating the software and data stored in the memory of the vendor's computer." Plf's Ex. 93, Tab 1 at 12, *ll.* 15–17. The same statement is included in the specification of the '490 Patent. *See* '490 Patent, Col. 7, *ll.* 1–2. Both of these statements refer to a preferred embodiment of the

invention, and neither conveys anything other than that the invention assumes, without limiting, classification of the data to be stored, maintained and used as claimed in the patent.

Similarly, Compuserve cites Hill's March 9, 1994, response to an office action, which Compuserve describes as Hill's admission "that the constant data is identified even before being loaded or transferred to the customer's computer from a main computer," in support of the proposed limitation. *See* Plf's Ex. 93, Tab 6 at 4. It provides no such support. In his response to the examiner, Hill described examples of the types of data that might be stored as constant or variable data. *Id.* That general description does not constitute an admission of anything about who classifies the data or when. Consequently, the Court finds that a limitation in the claim terms "constant and variable data" requiring the vendor to classify the data before operation of the system is not warranted by the intrinsic evidence in the patent.

The second attribute proposed by Compuserve concerns whether constant and variable data must be defined in terms of whether it relates to one, or more than one, product. In support of this limitation Compuserve offers an excerpt from the specification in which constant data is described as including "logo, graphics data for outlines and boxes, format data which labels the units of the product specifications ... and graphics data illustrating the configuration of various products." '490 Patent, Col. 9, *ll.* 41–45. This description is found in the portion of the specification that is a detailed description of a preferred embodiment. Compuserve offers no reason to the Court for importing this limitation from a preferred embodiment into the claim term of "constant data." Nor can the Court discern one.

Further support for this limitation, according to Compuserve, is found in a reference in the prosecution history which shows that "constant data can relate to multiple products." Def's Brf. at 15. In the reference, the patentee described an amendment to Claims 1, 15, 30 and 35, made in response to the patent examiner's earlier rejection of those claims. *See* Plf's Ex. 93, Tab 9 at 5. The amendment was intended to clarify the nature of constant data as "a subset of the product information data." *Id.* In their final form, the claims referred to "a subset of product information data related to the at least one product," or "a subset of product information data related to the plurality of products." '490 Patent, Col. 21, *ll.* 64–66, Col. 23, *ll.* 37–39. Given the fact that in Claim 1 the constant data is described as a subset relating to "the at least one product," it does not follow that constant data itself must be defined as capable of being related to more than one product. Apparently, the patent contemplates constant data that can relate to only one product. For this reason, it would be improper to limit the definition of constant data to data that can be related to multiple products.

A similar problem prevents the importation of a limitation that variable data must relate only to one product, from Compuserve's designation of a passage from the summary of the invention. That passage describes the transmission of variable data "related to the specific product selected by the customer." '490 Patent, Col. 2, *ll.* 17–18. The fact that the invention contemplates the *transmission* of variable data related to a specific product in order to create a product information sheet does not mean that each piece of variable data only relates to one file. For example, a variable data file may include information about the horsepower of an engine, and the specific product selected may have that size of an engine. This does not mean that there are no other products with that size of an engine. Compuserve's argument that variable data files must only relate to a single product is not required or even suggested by the intrinsic evidence of the patent. The Court will not import this limitation into the definition of constant and variable data.

The next limitation suggested by Compuserve relates to the sequence of transmission of the constant and variable data. Before this limitation could be an element of the definition of these two claim terms, the Court must find that the sequence of steps in the method claims is mandated. Assuming, without deciding, that it is, there is no evidence that supports including this characteristic in a definition of the claim terms "constant and variable data." The ordinary meanings for those terms, as modified to reflect that constant data is data that will be changed, suffices for purposes of understanding the method claims in which the terms appear. Compuserve has pointed to details from the specification that describe differences in how the constant or variable data is treated, but has provided no reason for the Court to find that a "special and particular definition [was] created by the patent applicant." *See Renishaw*, 158 F.3d at 1249. Nor has Compuserve demonstrated that the common dictionary meanings for these terms, as modified, would be "nonsensical in light of the patent disclosure." *See id.* at 1250. Consequently, the Court will not import this limitation into the definitions for constant or variable data.

The last element Compuserve seeks to add to the definition of these claim terms is whether the main revision level is incremented when changes occur to the data. This limitation is described as "another way for the Court to distinguish constant data from variable data." Def's Brf. at 17. However, Compuserve has not provided the Court with any reason why the differences already noted between constant and variable data will not suffice to make clear the meaning of each term. While it may be true that both Hill and his expert witness have indicated that it would be difficult to classify data into such categories simply by looking at the data on the computer, that fact does not mean that constant and variable data must be defined in a way that allows such a visual classification. *See* Hill Dep. at 190–91; Tr. Vol. I at 127. There are various ways of determining which data is constant and which is variable other than just looking at the data files. One example, suggested by Hill during his deposition but also supported in the claims, is to look at how the data is handled by the electronic catalog system. *See* Hill Dep. at 191; '490 Patent, Col. 21, ll. 56–61 (noting that main revision status indicates revision level of constant data stored in main computer). Another would be to observe the relative number of changes the data has undergone over time, to determine its rate of change in comparison to other data. Hill's expert testified that a person skilled in the art would know how to divide the data into constant and variable data. Tr., Vol. I at 127. Moreover, contrary to Compuserve's claim construction theory, the definitions of these claim terms need not be limited by the differences in how they are treated in order for those differences to provide clues about which data is constant or variable.

The key here is that Hill's patent is not about the proper classification of data for an electronic catalog system. It is about distributing that data between two different computers, a main and a remote, establishing a system for updating the data left on the remote computer, and transmitting the updated variable data to the remote to create the most current product information available. It presumes some sort of classification of the data, but does not limit how that is accomplished. Thus, the Court finds that the definition for "variable data" that is most true to the claim language and in alignment with the patent's description of the invention, *see Renishaw*, 158 F.3d at 1250, is "product information classified as capable of changing at any time." The definition that best conveys the meaning of "constant data" is "product information classified as likely to change less often than variable data."

## G. Revision Status

▇ In Claim 1, the method calls for "storing and maintaining" a "main revision status" in the main computer's memory and a "remote revision status" in the re-

mote computer's memory. '490 Patent, Col. 21, *ll.* 57–59, 63–66. Both of these terms' definitions are suggested in the claim itself as "indicating the revision level of the constant [remote] data stored in the main [remote] computer." *Id.* Because the revision status is "stored and maintained," or transmitted from one computer to the other, it must comprise information similar to the data files referred to elsewhere in the patent. Hill's proposed definition of revision status is "something that indicates the last time an item was revised." Compuserve proposes a definition containing more details:

> "A main revision status" is a single current version level number or symbol and is capable of being associated with multiple files. When compared through remote revision status, it permits identification of all constant data files on the main computer necessary to achieve synchronization with the constant data on the remote computer.

Def's Brf. at 27. Its proposed definition for "remote revision status" is virtually the same with respect to the remote computer. Essentially, three elements have been added by Compuserve that the Court will address: 1) the notion of a "single current version level" that is 2) a "number or symbol" and that is 3) "associated with multiple files." The fourth element, that the revision status is capable of being compared with a remote revision status to identify the constant data files on the remote computer that need to be updated, describes a use for the revision status that is specifically claimed in the patent. Consequently, it need not be part of the definition of the term.

Compuserve objects to Hill's proposed definition because it includes the concept of "time," which is not suggested in the example used in the specification. For this argument to succeed, Compuserve must show the Court why it should define revision status only in terms of how it is described in a preferred embodiment. It has not done so. Rather, Compuserve has only pointed out the difference between Hill's proposed definition and the specific example used in the specification's preferred embodiment. Moreover, Hill's expert testified that one of ordinary skill in the art would know that revision status could be expressed as a symbol, a time stamp, or other interchangeable equivalents. Tr., Vol. I at 62–67 ("anyone with ordinary skill in computer science ... would realize there are a number of ways of indicating the revision status of a particular piece of information." Tr. at 64.). No contradictory evidence was presented to refute Dr. Dunsmore's description of what one of ordinary skill in the art would know, and the Court accepts the guidance provided by this expertise. The limitation that the revision status be expressed as a number or symbol will not be imported from the specification into this claim term.

Compuserve also objects to Hill's definition because it does not require a single main revision status level, or remote revision status level, that would relate to multiple constant data files. In support of this contention, Compuserve notes that the claims refer to "*a* main revision status," to "*the* main revision status," to "*a* remote revision status," and to "*the* remote revision status." '490 Patent, Col. 21, *ll.* 54–69 (emphasis added). In other words, Compuserve argues that the "single" limitation is required by the use of singular language when referring to revision status. The Court does not agree. The use of definite and indefinite articles in claims drafting does not resolve the question of whether the patentee contemplates only one, or one or more, of an item. For example, in the second step of Claim 1, after the first step has introduced the concept of "related to at least one product," the patentee used the "singular" definite article "the" to modify "at least one product." '490 Patent, Col. 21, *ll.* 62–63. There can be no question that "at least one product" implies it could be more than one. A similar construction is used frequently in the claims. *See, e.g.,* '490 Patent, Col. 21, *ll.* 65–66, Col. 22, *ll.* 9–10, 12–15, 40–42 ("related to *the* a selected product"), Col. 25, *ll.* 22–23, 24–25. Moreover, it is understood

that the electronic catalog system in the invention covers a system that may have more than one remote computer, but each time remote computer is mentioned it' is modified by "the" or "a." *See, e.g.,* '490 Patent, Col. 21, *ll.* 63–64, 66, Col. 22, *ll.* 1–2, 5–6, 8, 18–20, 23, 53, Col. 23, *ll.* 31, 36–37, 42, 45–48. Consequently, the Court finds that the language used in the claim does not require there to be a single current version level expressed as the revision status.

With respect to the notion of the revision status being associated with multiple files, the Court finds no evidence in the patent that requires this as a limitation in the definition. During his testimony, Dr. Dunsmore provided the Court with a description of the relationship between revision status and revision levels as understood by those of ordinary skill in the art. Specifically, he analogized "revision status" to a mailbox that could hold a number of messages, and that could be accessed to discover what has been revised. The items in the "mailbox" are the various "revision levels" that indicate the entire state of revisions expressed by the revision status. Tr., Vol. I at 68. A revision level is the precise number, symbol, time stamp, or other expression of the version of the data that has been revised. *Id.* Using this analogy, it is conceivable that a revision status could encompass multiple revision levels relating to data that has been changed.

In sum, the Court finds that the definition proposed by Compuserve contains too many limitations on the meaning of the "revision status" claim term. Hill's proposed definition comes closer to the meaning of the term, but it lacks a more specific connection to the language of the claims. Because the term is modified by the claim language itself as "indicating the revision level of the constant data" stored in either the remote or the main computer, the Court will modify the plaintiff's proposed definition to incorporate that limitation. Instead of "something that indicates the last time an item was revised," the Court finds that the better definition is "an indi-cation of the revision level of the relevant constant data."

## H. Order of Steps

In the course of construing the claim terms in dispute the parties have also reached an impasse about whether the sequence of the steps in method Claims 1 and 15 is dictated by the order recited in the patent. Compuserve argues that at least some of the steps must be performed in the order recited, whereas Hill contends that the order does not matter. For example, in Claim 1 the steps are recited as follows:

storing and maintaining variable data and constant data . . . and a main revision status in a memory of a main computer, the main revision status indicating the revision level of the constant data stored in the main computer;

storing constant data . . . and a remote revision status in a memory of a remote computer . . . the remote revision status indicating the revision level of the constant data stored in the remote computer;

transmitting the remote revision status from the remote computer to the main computer;

comparing the remote revision status with the main revision status;

updating constant data stored in the memory of the remote computer with constant data maintained in the memory of the main computer that is different from the constant data stored in the memory of the remote computer;

transmitting variable data . . . from the main computer to the remote computer; and

integrating constant data . . . with the variable data. . . in the remote computer to generate the information data . . . including both constant data and variable data.

'490 Patent, Col. 21, *ll.* 57–67, Col. 22, *ll.* 1–16.

Unless the specific claim language, or some other mandate, requires a certain order of steps in a method claim, the order of the steps need not correspond to the order recited in the method claim. *See Mantech*, 152 F.3d at 1375. However, even if the claim language does not dictate the sequence of the steps, the court still must look to see if a particular order is required by the context. *See Id.* In *Mantech*, a method was claimed for remediating a contaminated subterranean body of groundwater that included the steps of "(a) providing a plurality of mutually spaced wells ... (b) providing a treating flow of an aqueous solution ... into said groundwater ... (c) introducing a turbulent flow of an aqueous solution ... into said groundwater ... and (d) providing a treating flow of hydrogen peroxide solution from one or more of said wells into said groundwater ... for oxidizing said contaminants." *Id.* at 1375, n. 13. The patentee argued that there was no claim language or other mandate in the specification that required performance of the steps in the order recited. *Id.* The court disagreed, and carefully reviewed the steps and applied logic and practicality to discern a required order. *Id.* For example, the first step in the method claim was to provide wells, which the court found was a necessary precursor to any of the other steps that involved activities performed by means of those wells.

Similarly, the Court finds that certain steps must naturally precede others for the Hill invention to function as described. Constant and variable data, as well as a constant revision status, must be stored on the main computer before any subsequent operations may occur. Thus, the first step recited in Claims 1 and 15 must actually occur first. The second recited step, relating to storing constant data on the remote computer, conceivably could occur simultaneously with the first step, but it would be illogical for it to occur prior to the time that constant and variable data were stored on a main computer. Practically speaking, there must first be an electronic catalog system before a customer would be likely to desire access to it. Likewise, unless all constant and variable data were in the memory of a main computer, any attempt by a remote computer to access such data would meet with a significant delay while the data was stored on the main computer.

Step three involves transmitting a remote revision status from the remote computer to the main computer, which step must follow the second step, in which a remote revision status is stored on the remote computer. Logically, one cannot transmit what is not there. Similarly, the recited step three must occur before the step four, which involves comparing the remote revision status with the main revision status. Such a comparison could not occur unless the remote revision status had already been sent to the main computer. Step five, which covers the process of updating constant data on the remote computer with constant data on the main computer that is different, cannot be performed until after the comparison between the two revision statuses. Without the comparison, there would be no way of determining if the constant data on the remote computer was different from that on the main computer.

It is not so clear, however, whether step five (updating constant data) must precede step six (transmitting variable data). Although both the constant data update and the variable data transmission must occur before the two computers disconnect, and before both sets of data are on the remote computer, there is nothing that would logically or practically prohibit the transmission of one before the other. According to Hill's expert, the invention would still work regardless of the order of their arrival at the remote computer, and there is no technological reason for a specific order. Tr., Vol. I at 90–91. Regardless of the order of arrival of the updated constant data and the specific variable data, all must have been transmitted from the main computer to the remote computer before the integration step can occur to produce a display of the product information. Thus, step

seven must follow all of the preceding steps.

In sum, logic and practicality dictate that in Claim 1 the method steps one through four must occur in the sequence recited by the claim. They also must occur prior to steps five through seven. Likewise, steps five and six both must have occurred before step seven may be accomplished. However, the steps involving updating the constant data on the remote computer and transmitting variable data related to at least one product are interchangeable. The specification describes these steps only in the order recited in the claim, yet nothing in the specification mandates that order. Hill's expert agreed that these two steps could occur in any order, just as long as they both occurred before step seven, the integration step. Tr., Vol. I at 90–91. The order of transmission of updated constant data and specific variable data was a primary area of dispute between the parties, with Compuserve arguing that the order given in the claims must be followed, and Hill stating that the order did not matter. The Court finds that with respect to these two steps only, the order given in the claims is not mandated by the claim language, or logic or practicality.

### III. CONCLUSION

After holding a hearing at which evidence and arguments were presented by both parties in this action, the Court has been asked to construe the meaning of six claim terms and determine whether the order of the steps recited in the method claims must be followed. The terms have been defined as discussed in each section of this entry based on the best information available to the Court at this time. They were construed without benefit of any knowledge of the actual merits of the alleged infringement claim. Likewise, the Court has determined that the order of all but two of the steps recited in the method claims is required, as further explained in section II(H). Having no other matters to resolve at this time, the Court refers the parties to the Scheduling Order Entry For February 11, 1999, in which is provided

guidance with respect to scheduling of activities subsequent to this *Markman* ruling.